Bob CARY, David Nykerk, Glenn Reed, Laurel Stonbraker and Lee Bridgeman, Plaintiffs-Appellants and Cross-Appellees,

v.

BOARD OF EDUCATION OF the ADAMS–ARAPAHOE SCHOOL DISTRICT 28–J, AURORA, COLORADO, Doyle K. Seawright, Douglas A. Johnson, DeWitte C. Gordon, and Glenna G. James, as members of the Board of Education of the Adams-Arapahoe School District 28–J, Defendants-Appellees and Cross-Appellants.

Nos. 77–1297, 77–1298.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 26, 1978.

Decided July 10, 1979.

536

Charles W. Newcom, Denver, Colo. (Susan D. Proctor, Denver, Colo., with him on the brief), of the American Civil Liberties Union Foundation of Colo., Inc., Denver, Colo., for plaintiffs-appellants and cross-appellees.

Eugene F. McGuire, Denver, Colo. (Richard G. Caldwell and James L. White, Denver, Colo., with him on the brief), of Holland & Hart, Denver, Colo., for defendants-appellees and cross-appellants.

David M. Rabban, Washington, D. C. (Matthew W. Finkin, Dallas, Tex., of counsel), filed an amicus curiae brief for American Ass'n of University Professors.

Dennis E. Valentine, Colo. Ed. Ass'n, Englewood, Colo., Larry F. Hobbs, Denver, Colo., Michael H. Gottesman, Robert M. Weinberg and David M. Silberman, Washington, D. C., and David Rubin, N. E. A., Washington, D. C., filed an amicus curiae brief for N. E. A., Colo. Ed. Ass'n and Aurora Ed. Ass'n.

Jay W. Swearingen, Denver, Colo., filed an amicus curiae brief for the Colo. Ass'n of School Boards.

Before DOYLE and LOGAN, Circuit Judges, and STANLEY, Senior District Judge.*

LOGAN, Circuit Judge.

This is an appeal from summary judgment denying relief in a declaratory judgment action which sought enforcement of claimed rights under the First and Fourteenth Amendments to the United States Constitution. The action was brought by five high school teachers who asserted their rights were violated when the Board of Education for the Adams-Arapahoe School District in Colorado (the board) banned ten books from use in the teachers' language arts classes.

The trial court found the teachers had a First Amendment right to choose these books for use in their high school English courses, but determined their constitutional rights were waived under the terms of a

* Of the District of Kansas, sitting by designation.

collective bargaining agreement entered into between the Aurora Education Association (AEA), to which they belonged, and the school district. The teachers have appealed from the adverse ruling on the waiver question; the board has cross-appealed on the constitutional law decision. The case has attracted amicus curiae briefs from the American Association of University Professors, the National Education Association, Colorado Education Association and Aurora Education Association, and the Colorado Association of School Boards.

The relevant facts were stipulated; both sides sought summary judgment. All plaintiffs are tenured teachers who teach high school language arts classes in the defendant school district. The classes involved are elective courses for eleventh and twelfth grade students—Contemporary Literature, Contemporary Poetry, and American Masters—which under the board regulations were designed for elective optional reading materials chosen from classroom libraries or personal sources.

The board first adopted a policy on selection of text material in January, 1975. A High School Language Arts Text Evaluation Committee was established to review current and new materials for language arts courses. Membership was composed of representative teachers, administrators, parents and students. The committee reviewed many books which had been used or were recommended for use in these courses. It was instructed to utilize specified criteria: appropriateness to the grade level, value of the material in relation to the course objectives, and fiscal considerations. The guidelines adopted by the board required a written response, including reasons, when suggested materials were rejected.

Only one book was rejected by the majority report of the committee, with apparently 1,285 books approved. A minority report filed by three members listed nine more books they would reject. The recommended texts were on public display for twelve days. Then at a regularly scheduled public meeting of the school board, and following an open discussion, the board voted to approve a list of 1,275 books for use in language arts classes in the high schools. Ten recommended books, all of which had previously been used in those classes, were excluded from the approved list;[1] six of the ten were among those not recommended in the minority report. The majority and minority reports made reference to the specified criteria in discussing titles they rejected, but the board itself set forth no written statement of the reasons for its vote to ban the ten books. Its edict to the teachers issued after the meeting simply referenced the list of books not being approved and made the following declarations:

Books which are not approved for instructional use will not be purchased, nor used for class assignment, nor will an individual be given credit for reading any of these books.

The books should be given to the Department Chairman who is asked to hold the books pending further directions from the Division of Instructional Services.

Also, each teacher should review the lists of approved materials for each class he/she will be teaching second semester. If the teacher anticipates using any materials not listed, those materials must receive prior approval by the Division of Instructional Services. The Department Chairman and the building Principal

---

1. The banned volumes were:
  a. Contemporary Literature:
    (1) *A Clockwork Orange* by Anthony Burgess;
    (2) *The Exorcist* by William P. Blatty;
    (3) *The Reincarnation of Peter Proud* by Max Ehrlich.
  b. Contemporary Poetry:
    (1) *New American Poetry* by Donald Allen;
    (2) *Starting from San Francisco* by Lawrence Ferlinghetti;
    (3) *The Yage Letters* by William Burroughs and Allen Ginsberg;
    (4) *Coney Island of the Mind* by Lawrence Ferlinghetti;
    (5) *Kaddish and Other Poems* by Allen Ginsberg;
    (6) *Lunch Poems* by Frank O'Hara.
  c. American Masters:
    *Rosemary's Baby* by Ira Levin.

should submit that recommendation immediately to Jim Hamilton.

An unwritten board policy had permitted substitution of materials for assignments offensive to a student or his or her parents. That policy was formally adopted by the board in written form after the meeting above described.

By stipulation the parties agreed the books were not obscene, no systematic effort had been made to exclude any particular system of thought or philosophy, and a "constitutionally proper decision-maker" could decide these books were proper for high school language arts classes. It was agreed that the plaintiff teachers were subject to dismissal from their positions for insubordination for any of the following acts:

(a) adding any of the subject textbooks to the reading list of their courses;

(b) assigning the reading of any of the subject textbooks;

(c) giving any student any credit in courses for reading any of the subject textbooks;

(d) reading aloud or causing to be read aloud any of the subject textbooks in the classroom during class time; or

(e) discussing with students in the classroom during class time any of these materials at such length so as to amount to a constructive assignment of the materials.

## I

We first consider whether the trial court correctly determined the asserted rights were waived by the collective bargaining agreement.

During contract negotiations the teachers' union (AEA) attempted unsuccessfully to obtain provisions in the agreement under an "academic freedom" heading which would require "questioned material," evidently including readings such as those at issue here, to be referred to a Teachers Advisory Council. Other proposals would have exempted from such referral materials, textbooks and practices already being utilized and "new supplementary materials on textbooks by individual teachers where such use is optional and left to the discretion of the individual teacher."

The relevant provisions of the agreement finally adopted are as follows:

Art. 5 § 2 . . . "Board Rights" [reserved to the school board] as used herein includes the right to: . . . (i) Determine the processes, techniques, methods and means of teaching any and all subjects.

.     .     .     .     .

Art. 7 § 2: The Board agrees that it will not directly or indirectly discourage, deprive or coerce any employee in the enjoyment of any rights conferred by any laws of the State of Colorado or the Constitution of the State of Colorado and the United States.

.     .     .     .     .

Art. 46 § 6: *Academic freedom*—The parties seek to educate young people in the democratic tradition, to foster a recognition of individual freedom and social responsibility, to inspire meaningful awareness of and respect for the Constitution and the Bill of Rights.

Freedom of individual conscience, association, and expression will be encouraged and fairness in procedures will be observed both to safeguard the legitimate interests of the schools and to exhibit by appropriate examples the basic objectives of a democratic society as set forth in the Constitution of the United States and the State of Colorado.

The final responsibility in the determination of the above rests with the Board.

We also consider relevant a portion of Colo.Rev.Stat. § 22–32–109 which provides:

(1) In addition to any other duty required to be performed by law, each board of education shall have and perform the following specific duties:

.     .     .     .     .

(t) To determine the educational programs to be carried on in the schools of the district, and to prescribe the textbooks for any course of instruction or study in such programs;

The state statute would appear to give the Board the right to select textbooks, including those used in elective courses, insofar as the state may do so consistent with the federal and state constitutions. The collective bargaining agreement does not purport to surrender that right to the teachers. The board retains control over the "means of teaching any and all subjects," Art. 5 § 2(i), which surely must include the texts used.

At the same time the contract purports to recognize the teachers' constitutional rights. Art. 7 § 2. The only section which might be construed as a waiver of constitutional rights is the sentence at the end of Art. 46 § 6, in a section labeled "academic freedom," stating the "final responsibility in the determination of the above rests with the Board."[2] We do not construe the sentence as a deliberate waiver of teachers' constitutional rights. Rather it seems a cautionary clause, a reminder that the board retains control over the techniques, method and means of teaching the courses, as is set forth in Art. 5 § 2(i).

We thus construe the contract as giving control over textual material to the school board insofar as it can be done consistent with the federal and Colorado constitutions. We do not construe it to call for waiver of teachers' individual constitutional rights. It gives the teachers neither more nor less than their constitutional entitlements. Therefore we do not have to consider whether the AEA had the power to surrender constitutional rights of the teachers.

## II

We recognize and support the concept that "teachers [do not] shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). This general commitment has been stated eloquently on occasion:

Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker, supra,* [364 U.S. 479] at 487, [81 S.Ct. 247, at 251, 5 L.Ed.2d 231]. The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection." *United States v. Associated Press,* [D.C.,] 52 F.Supp. 362, 372.

*Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967).

To regard teachers—in our entire educational system, from the primary grades to the university—as the priests of our democracy is therefore not to indulge in hyperbole. It is the special task of teachers to foster those habits of open-mindedness and critical inquiry which alone make for responsible citizens, who, in turn, make possible an enlightened and effective public opinion. Teachers must fulfill their function by precept and practice, by the very atmosphere which they generate; they must be exemplars of open-mindedness and free inquiry. They cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied to them.

. . .

*Wieman v. Updegraff,* 344 U.S. 183, 196, 73 S.Ct. 215, 221, 97 L.Ed. 216 (1952) (Frankfurter, J., concurring).

Most of the cases, however, have arisen at the university level, and outside the area of

---

2. The term "academic freedom," of course, encompasses much more than teaching-related speech rights of teachers. *See Developments in the Law—Academic Freedom,* 81 Harv.L. Rev. 1045 (1968).

curricular decisions and teaching-related speech in the classroom.

In only two instances has the United States Supreme Court discussed prohibitions against what might be taught students as part of a school's curriculum. In *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), and its companion case, *Bartels v. Iowa,* 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047 (1923), the Court struck down state laws making it a crime to teach subjects in any language other than English prior to the time the students completed the eighth grade. The decision was based upon due process grounds and contains little reasoning of aid to us in the instant case.[3] It demonstrates, however, the Supreme Court, when it considers it has an appropriate case, will interfere with a curricular decision made by state or local authorities.

Mr. Justice Holmes dissented in *Meyer* and *Bartels* stating that he was not prepared to say it is unreasonable to require a school child in his early years to hear and speak only English at school.

> No one would doubt that a teacher might be forbidden to teach many things, and the only criterion of his liberty under the Constitution that I can think of is "whether, considering the end in view, the statute passes the bounds of reason and assumes the character of a merely arbitrary fiat." . . .

262 U.S. at 412, 43 S.Ct. at 630.

Another noted civil libertarian, Mr. Justice Black, has rejected the views expressed in *Meyer* and severely criticized it. *See Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 519–22, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (dissenting opinion).

In the second case, *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), the Court struck down a "monkey" law making it a crime and subjecting a teacher to dismissal for teaching the theory of evolution in state schools. The Court based its decision on the establishment of religion clause in the First Amendment. In keeping with somewhat sweeping language in the opinion, and perhaps Mr. Justice Stewart's statement in his concurring opinion, all parties in the instant case seem to treat *Epperson* as prohibiting the exclusion of an entire system of respected human thought from a course offered by the school. The Court in *Epperson* recognized that public education is committed to the control of state and local authorities, and the courts "do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." 393 U.S. at 104, 89 S.Ct. at 270. It cited *Meyer* for the proposition that the Court would strike down "arbitrary" restrictions upon freedom of teachers to teach and of students to learn.

Relevant to our inquiry, Mr. Justice Black, in a concurring opinion, declared:

> I am also not ready to hold that a person hired to teach school children takes with him into the classroom a constitutional right to teach sociological, economic, political, or religious subjects that the school's managers do not want discussed. This Court has said that the rights of free speech "while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time." *Cox v. Louisiana,* 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471; *Cox v. Louisiana,* 379 U.S. 559, 574, 85 S.Ct. 476, 485–486, 13 L.Ed.2d 487. I question whether it is absolutely certain, as the Court's opinion indicates, that "academic freedom" permits a teacher to breach his contractual agreement to teach only the subjects designated by the school authorities who hired him.

---

3. The decision might well have been supportable on other grounds. *See* Goldstein, *The Asserted Constitutional Right of Public School Teachers to Determine What They Teach,* 124 U.Pa.L.Rev. 1293, 1306 n.42 (1976). *Meyer* has survived generally to be viewed as a parental rights case standing as authority that parents have some constitutional rights to raise their children as they see fit. *Id.* at 1307–1308.

393 U.S. at 113 114, 89 S.Ct. at 275. Mr. Justice Stewart, concurring in result, stated:

> The States are most assuredly free "to choose their own curriculums for their own schools." A State is entirely free, for example, to decide that the only foreign language to be taught in its public school system shall be Spanish. But would a State be constitutionally free to punish a teacher for letting his students know that other languages are also spoken in the world? I think not.
>
> It is one thing for a State to determine that "the subject of higher mathematics, or astronomy, or biology" shall or shall not be included in its public school curriculum. It is quite another thing for a State to make it a criminal offense for a public school teacher so much as to mention the very existence of an entire system of respected human thought.

393 U.S. at 115, 116, 89 S.Ct. at 276.

In one other case the Supreme Court affirmed without opinion a three-judge district court decision which upheld a Michigan statute forbidding instruction in public schools on the subject of birth control. *Mercer v. Michigan State Bd. of Educ.,* 379 F.Supp. 580 (E.D.Mich.), *aff'd mem.,* 419 U.S. 1081, 95 S.Ct. 673, 42 L.Ed.2d 678 (1974). The case was fraught with problems, including whether the plaintiff had standing to sue and whether there was a real case or controversy. Nonetheless, the majority opinion treated the constitutional issue and declared:

> The State has the power to establish the curriculum or to delegate some of its authority to local agencies for the final shaping of the curriculum. It also has the power to permit the parents to make the final decision as to exactly which courses the child should take. Implicit in such a state of the law is the observation that a teacher does not have a right, Constitutional or otherwise, to teach what he sees fit, or to overrule the parents' decision as to which courses their children will take unless, of course, the State has in some manner delegated this responsibility to the teacher which is not the case here.

379 F.Supp. at 586.

*West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), struck down a law which required students to participate in a daily salute to the American flag. At first blush it might be considered a case of interference with a school curriculum. But the Court appeared to recognize that a state might require instruction in the history, structure and organization of the U. S. government which tend to inspire patriotism and love of country. But it distinguished that situation from the required flag salute which it treated as "a compulsion of students to declare a belief." 319 U.S. at 631, 63 S.Ct. at 1182.

Quite a number of circuit and district court decisions have involved claims of school board or school authorities' interference with teachers' First Amendment rights to conduct their classes as they see fit in exercise of their professional judgment. Most were discharge cases where the teacher was fired, or a contract not renewed, for allegedly offensive behavior, poor teaching techniques and insubordination. Conflicts over the teachers' use of dirty words in class, or assignment of reading materials containing dirty words, seeming approval of free love, drugs or rebellion against authority, were generally part of a charge of inappropriate conduct alleged to constitute good cause for discharge. The cases which held for the teachers and placed emphasis upon teachers' rights to exercise discretion in the classroom, seemed to be situations where school authorities acted in the absence of a general policy, after the fact, and had little to charge against the teacher other than the assignment with which they were unhappy. *See Sterzing v. Fort Bend Independent School Dist.,* 376 F.Supp. 657 (S.D.Tex.1972), *vacated on remedial grounds,* 496 F.2d 92 (5th Cir. 1974); *Mailloux v. Kiley,* 436 F.2d 565 (1st Cir. 1971), *on remand,* 323 F.Supp. 1387 (D.Mass.), *aff'd on other grounds,* 448 F.2d 1242 (1st Cir. 1971); *Keefe v. Geanakos,* 418 F.2d 359

(1st Cir. 1969); *Parducci v. Rutland,* 316 F.Supp. 352 (M.D.Ala.1979). *Cf. Wilson v. Chancellor,* 418 F.Supp. 1358 (D.Or.1976) (ban on speaker). In the cases where the teachers' First Amendment claims were rejected, generally the school authorities had other good grounds supporting their discharge or nonrenewal of the teacher's contract. *Adams v. Campbell County School Dist.,* 511 F.2d 1242 (10th Cir. 1975); *Brubaker v. Board of Educ.,* 502 F.2d 973 (7th Cir. 1974), *cert. denied,* 421 U.S. 965, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975); *Clark v. Holmes,* 474 F.2d 928 (7th Cir. 1972), *cert. denied,* 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973); *Ahern v. Board of Educ.,* 456 F.2d 399 (8th Cir. 1972); *Moore v. School Bd. of Gulf County,* 364 F.Supp. 355 (N.D.Fla.1973); *Parker v. Board of Educ.,* 237 F.Supp. 222 (D.Md.), *aff'd per curiam,* 348 F.2d 464 (4th Cir. 1965), *cert. denied,* 382 U.S. 1030, 86 S.Ct. 653, 15 L.Ed.2d 543 (1966).

Closer to the instant situation perhaps are the cases where the school board voted to remove certain volumes from the school library which it found objectionable. *Minarcini v. Strongsville City School Dist.,* 541 F.2d 577 (6th Cir. 1976), held students had a First Amendment right to know which did not permit removal of books based solely on the "social or political tastes of school board members." *Id.* at 582. Considering an order of a school board to remove a book from its junior high library the board found offensive, the Second Circuit saw no substantial constitutional issue at all. *Presidents Council v. Community School Bd., No. 25,* 457 F.2d 289 (2d Cir.), *cert. denied,* 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972). It said:

> After a careful review of the record before us and the precedents we find no impingement upon any basic constitutional values. Since we are dealing not with the collection of a public book store but with the library of a public junior high school, evidently some authorized person or body has to make a determination as to what the library collection will be. It is predictable that no matter what choice of books may be made by whatever segment of academe, some other person or group may well dissent. The ensuing shouts of book burning, witch hunting and violation of academic freedom hardly elevate this intramural strife to first amendment constitutional proportions. If it did, there would be a constant intrusion of the judiciary into the internal affairs of the school. Academic freedom is scarcely fostered by the intrusion of three or even nine federal jurists making curriculum or library choices for the community of scholars. When the court has intervened, the circumstances have been rare and extreme and the issues presented totally distinct from those we have here. See Developments in the Law—Academic Freedom, 81 Harv.L.Rev. 1045, 1051–1054 (1968).

457 F.2d at 291–92.

The instant case, of course, involves prohibiting high school teachers from assigning books which they had used previously and want to use again in classes where "a constitutionally proper decision-maker" could find them appropriate. Thus we are presented with a conflict between the school board's powers over curriculum and the teachers' rights to classroom expression in a context somewhat different and more sharply drawn than any case which has arisen heretofore. We will decide only the case before us, and cannot answer all of the questions raised by the commentators interested in this area.[4]

The parties before us state the proposition for decision somewhat differently one from the other. The teachers acknowledge the right of the school board to prescribe the curriculum and the principal textbooks used in the courses. They agree the school board does not have to offer the three courses at issue here; but they say that once the courses have been approved the teachers' "right of academic freedom in-

---

4. *See, e. g.,* Goldstein, *supra,* note 3; Miller, *Teachers' Freedom of Expression . Within the Classroom: A Search for Standards,* 8 Ga.L. Rev. 837 (1974); Van Alstyne, *The Constitutional Rights of Teachers and Professors,* 1970 Duke L.J. 841.

cludes the right to use non-obscene materials electively in elective courses taught to high school students." They do not ask the board to purchase or endorse certain books; they do not seek to require a student to read materials against the student's will; but they want to be free from restrictions "based upon the personal predilections of members of the school board."

The school board on the other hand states its position as follows:

A teacher is free to comment upon, or to recommend that any student read any of the ten books. Except as indicated below, he may discuss any of the books during class. Outside of class, a teacher may meet with any student anywhere, at anytime, for any length of time, for the purpose of reading or discussing any book. No student is prohibited from reading any book, except in class or otherwise for course credit . . . Classroom discussion of nonselected works is proscribed only when it becomes so protracted as to approximate or exceed the amount of class time spent on selected works or to effectively require that the student read the book in order to understand and benefit from class discussions. In short, the proscription relates only to activities which in substance, if not form, would reinstate the nonselected work on the reading list from which it was deliberately removed.

Reply Brief, p. 10.

▮▮▮ The concession by the school board is important. We think teachers do have some rights to freedom of expression in the classroom, teaching high school juniors and seniors. They cannot be made to simply read from a script prepared or approved by the board. As Mr. Justice Stewart noted in *Epperson,* the teacher cannot be punished for letting students know other languages are spoken in the world, or mentioning the existence of a system of respected human thought. Censorship or suppression of expression of opinion, even in the classroom, should be tolerated only when there is a legitimate interest of the state which can be said to require priority. *See West Vir-*

*ginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 633, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Students' speech cannot be stifled for mere "undifferentiated fear or apprehension of disturbance," nor from a desire to avoid controversy "without evidence that it is necessary to avoid material and substantial interference with school work or discipline." *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 508, 511, 89 S.Ct. 733, 737, 739, 21 L.Ed.2d 731 (1969). Surely there is some carryover of these principles to teachers' expressions in the context of course work and classroom teaching.

▮▮▮ At the same time we must recognize that the Supreme Court has ruled there is no constitutional right to an education. *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Whether there is a public education system is left to the states. Colorado has assumed the responsibility, and its constitution, Art. IX, § 15, provides the local school boards "shall have control of instruction in the public schools of their respective districts." It is recognized that these local decision-makers may determine what subjects are taught, even selecting ones which promote a particular viewpoint. *See West Virginia Bd. of Educ. v. Barnette,* 319 U.S. 624, 631, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). It is legitimate for the curriculum of the school district to reflect the value system and educational emphasis which are the collective will of those whose children are being educated and who are paying the costs. We recognized this in *Adams v. Campbell City School Dist.,* 511 F.2d 1242, 1247 (10th Cir. 1975), where we said:

Plaintiffs also argue that teachers have a First Amendment right to discuss controversial subjects and use controversial materials in the classroom. Undoubtedly they have some freedom in the techniques to be employed, but this does not say that they have an unlimited liberty as to structure and content of the courses, at least at the secondary level. Thus in a small community like Gillette the Board

members and the principal surely have a right to emphasize a more orthodox approach, for example, and it would seem that they may insist that record playing and current events do interfere with this program. We have found no law which allows a high school teacher to have the broad latitude which appellants seek.

■ If the board may decide that Contemporary Poetry may not be offered; if it may select the major text of the course; why may it not go further and exclude certain books from being assigned for instruction in the course? As we understand these language arts courses there is no basic text, or if there is one it is utilized only for a portion of the class study. A large part of the instructional time is review and discussion of items selected by students, with consent of the teacher, from the reading list. As adopted by the board the list contained altogether 1,275 titles approved for the three courses. Thus it can be said with some justification the texts adopted by the school board for these courses is the reading list. That, we believe, is the proper view of the situation before us; and the board was acting within its rights in omitting the books, even though the decision was a political one influenced by the personal views of the members.

We agree with the board characterization of the stipulation that it does not prohibit mention of these books in class, nor treatment by the teacher of the books as examples of contemporary poetry, literature or American masters. The ban is upon such extended reference or use in class as to constitute class assignments which in effect evade the exercise of discretion made by the board in its determination of the parameters of the courses.

■ Since the board gave no reasons for its refusal to approve these books we considered a remand to ascertain that the reasons were constitutionally permissible. It is at least clear the board could not structure its text designation to promote a particular religious viewpoint. *Epperson v. Arkansas, supra.* We also considered remand because the board adopted criteria for the approval of books by the committee charged with the duty to review, yet the board itself gave no reasons for its decision with respect to the ten books rejected. But the stipulation declares that no systemic effort was made "to exclude any particular type of thinking or book." And no objection was made that the board was not following its own standards in rejecting the books. The approved list is broad, containing 1,275 books for the three courses. No objection is made by the teachers that the exclusions prevent them from studying an entire representative group of writers. Rather the teachers want to be freed from the "personal predilections" of the board. We do not see a basis in the constitution to grant their wish.

The trial court entered judgment in favor of the defendant board and its members. Although we place our holding upon a different basis, we affirm that judgment.

WILLIAM E. DOYLE, Circuit Judge, concurring.

I concur in the result and in most of what appears in the opinion. I would, however, approach it somewhat differently. I would disapprove of any arbitrary selection of books that can be read and those which cannot be on the reading list. One can read the majority as, in effect, making such a ruling.

However, the court does not say it. It recognizes that the School Board has a broad right to select texts and to exclude textbooks. The approach which I prefer would be that the exclusion of books for secondary school students is not to be an arbitrary exclusion. Therefore, reasons have to be given so that there can be court review. If they are excluded because the Board member disapproves for a subjective reason, I would say that this is an unlawful and unconstitutional invasion of the class-room.

So, with the above exceptions, I concur in the submitted opinion.