# EPPERSON ET AL. *v.* ARKANSAS.

No. 7. Argued October 16, 1968.—Decided November 12, 1968.

*Eugene R. Warren* argued the cause for appellants. With him on the brief was *Bruce T. Bullion.*

*Don Langston,* Assistant Attorney General of Arkansas, argued the cause for appellee. With him on the brief was *Joe Purcell,* Attorney General.

Briefs of *amici curiae,* urging reversal, were filed by *Leo Pfeffer, Melvin L. Wulf,* and *Joseph B. Robison* for the American Civil Liberties Union et al., and by *Philip J. Hirschkop* for the National Education Association of the United States et al.

MR. JUSTICE FORTAS delivered the opinion of the Court.

### I.

This appeal challenges the constitutionality of the "anti-evolution" statute which the State of Arkansas adopted in 1928 to prohibit the teaching in its public schools and universities of the theory that man evolved from other species of life. The statute was a product of the upsurge of "fundamentalist" religious fervor of the twenties. The Arkansas statute was an adaptation of the famous Tennessee "monkey law" which that State adopted in 1925.[1] The constitutionality of the Tennessee law was upheld by the Tennessee Supreme Court in the celebrated *Scopes* case in 1927.[2]

The Arkansas law makes it unlawful for a teacher in any state-supported school or university "to teach the

---

[1] Chapter 27, Tenn. Acts 1925; Tenn. Code Ann. § 49–1922 (1966 Repl. Vol.).

[2] *Scopes* v. *State,* 154 Tenn. 105, 289 S. W. 363 (1927). The Tennessee court, however, reversed Scopes' conviction on the ground that the jury and not the judge should have assessed the fine of $100. Since Scopes was no longer in the State's employ, it saw "nothing to be gained by prolonging the life of this bizarre case." It directed that a *nolle prosequi* be entered, in the interests of "the peace and dignity of the State." 154 Tenn., at 121, 289 S. W., at 367.

theory or doctrine that mankind ascended or descended from a lower order of animals," or "to adopt or use in any such institution a textbook that teaches" this theory. Violation is a misdemeanor and subjects the violator to dismissal from his position.[3]

The present case concerns the teaching of biology in a high school in Little Rock. According to the testimony, until the events here in litigation, the official textbook furnished for the high school biology course did not have a section on the Darwinian Theory. Then, for the academic year 1965–1966, the school administration, on recommendation of the teachers of biology in the school system, adopted and prescribed a textbook which contained a chapter setting forth "the theory about the origin . . . of man from a lower form of animal."

---

[3] Initiated Act No. 1, Ark. Acts 1929; Ark. Stat. Ann. §§ 80–1627, 80–1628 (1960 Repl. Vol.). The text of the law is as follows:

"§ 80–1627.—Doctrine of ascent or descent of man from lower order of animals prohibited.—It shall be unlawful for any teacher or other instructor in any University, College, Normal, Public School, or other institution of the State, which is supported in whole or in part from public funds derived by State and local taxation to teach the theory or doctrine that mankind ascended or descended from a lower order of animals and also it shall be unlawful for any teacher, textbook commission, or other authority exercising the power to select textbooks for above mentioned educational institutions to adopt or use in any such institution a textbook that teaches the doctrine or theory that mankind descended or ascended from a lower order of animals.

"§ 80–1628.—Teaching doctrine or adopting textbook mentioning doctrine—Penalties—Positions to be vacated.—Any teacher or other instructor or textbook commissioner who is found guilty of violation of this act by teaching the theory or doctrine mentioned in section 1 hereof, or by using, or adopting any such textbooks in any such educational institution shall be guilty of a misdemeanor and upon conviction shall be fined not exceeding five hundred dollars; and upon conviction shall vacate the position thus held in any educational institutions of the character above mentioned or any commission of which he may be a member."

Susan Epperson, a young woman who graduated from Arkansas' school system and then obtained her master's degree in zoology at the University of Illinois, was employed by the Little Rock school system in the fall of 1964 to teach 10th grade biology at Central High School. At the start of the next academic year, 1965, she was confronted by the new textbook (which one surmises from the record was not unwelcome to her). She faced at least a literal dilemma because she was supposed to use the new textbook for classroom instruction and presumably to teach the statutorily condemned chapter; but to do so would be a criminal offense and subject her to dismissal.

She instituted the present action in the Chancery Court of the State, seeking a declaration that the Arkansas statute is void and enjoining the State and the defendant officials of the Little Rock school system from dismissing her for violation of the statute's provisions. H. H. Blanchard, a parent of children attending the public schools, intervened in support of the action.

The Chancery Court, in an opinion by Chancellor Murray O. Reed, held that the statute violated the Fourteenth Amendment to the United States Constitution.[4] The court noted that this Amendment encompasses the prohibitions upon state interference with freedom of speech and thought which are contained in the First Amendment. Accordingly, it held that the challenged statute is unconstitutional because, in violation of the First Amendment, it "tends to hinder the quest for knowledge, restrict the freedom to learn, and restrain the freedom to teach." [5] In this perspective, the Act,

---

[4] The opinion of the Chancery Court is not officially reported.

[5] The Chancery Court analyzed the holding of its sister State of Tennessee in the *Scopes* case sustaining Tennessee's similar statute. It refused to follow Tennessee's 1927 example. It declined to confine the judicial horizon to a view of the law as merely a direction

it held, was an unconstitutional and void restraint upon the freedom of speech guaranteed by the Constitution.

On appeal, the Supreme Court of Arkansas reversed.[6] Its two-sentence opinion is set forth in the margin.[7] It sustained the statute as an exercise of the State's power to specify the curriculum in public schools. It did not address itself to the competing constitutional considerations.

Appeal was duly prosecuted to this Court under 28 U. S. C. § 1257 (2). Only Arkansas and Mississippi have such "anti-evolution" or "monkey" laws on their books.[8] There is no record of any prosecutions in Arkan-

---

by the State as employer to its employees. This sort of astigmatism, it held, would ignore overriding constitutional values, and "should not be followed," and it proceeded to confront the substance of the law and its effect.

[6] 242 Ark. 922, 416 S. W. 2d 322 (1967).

[7] "Per Curiam. Upon the principal issue, that of constitutionality, the court holds that Initiated Measure No. 1 of 1928, Ark. Stat. Ann. § 80–1627 and § 80–1628 (Repl. 1960), is a valid exercise of the state's power to specify the curriculum in its public schools. The court expresses no opinion on the question whether the Act prohibits any explanation of the theory of evolution or merely prohibits teaching that the theory is true; the answer not being necessary to a decision in the case, and the issue not having been raised.

"The decree is reversed and the cause dismissed.

"Ward, J., concurs. Brown, J., dissents.

"Paul Ward, Justice, concurring. I agree with the first sentence in the majority opinion.

"To my mind, the rest of the opinion beclouds the clear announcement made in the first sentence."

[8] Miss. Code Ann. §§ 6798, 6799 (1942). Ark. Stat. Ann. §§ 80–1627, 80–1628 (1960 Repl. Vol.). The Tennessee law was repealed in 1967. Oklahoma enacted an anti-evolution law, but it was repealed in 1926. The Florida and Texas Legislatures, in the period between 1921 and 1929, adopted resolutions against teaching the doctrine of evolution. In all, during that period, bills to this effect were introduced in 20 States. American Civil Liberties Union (ACLU), The Gag on Teaching 8 (2d ed., 1937).

sas under its statute. It is possible that the statute is presently more of a curiosity than a vital fact of life in these States.[9] Nevertheless, the present case was brought, the appeal as of right is properly here, and it is our duty to decide the issues presented.

## II.

At the outset, it is urged upon us that the challenged statute is vague and uncertain and therefore within the condemnation of the Due Process Clause of the Fourteenth Amendment. The contention that the Act is vague and uncertain is supported by language in the brief opinion of Arkansas' Supreme Court. That court, perhaps reflecting the discomfort which the statute's quixotic prohibition necessarily engenders in the modern mind,[10] stated that it "expresses no opinion" as to whether the Act prohibits "explanation" of the theory of evolution or merely forbids "teaching that the theory is true." Regardless of this uncertainty, the court held that the statute is constitutional.

On the other hand, counsel for the State, in oral argument in this Court, candidly stated that, despite the State Supreme Court's equivocation, Arkansas would interpret the statute "to mean that to make a student aware of the theory . . . just to teach that there was

[9] Clarence Darrow, who was counsel for the defense in the *Scopes* trial, in his biography published in 1932, somewhat sardonically pointed out that States with anti-evolution laws did not insist upon the fundamentalist theory in all respects. He said: "I understand that the States of Tennessee and Mississippi both continue to teach that the earth is round and that the revolution on its axis brings the day and night, in spite of all opposition." The Story of My Life 247 (1932).

[10] R. Hofstadter & W. Metzger, in The Development of Academic Freedom in the United States 324 (1955), refer to some of Darwin's opponents as "exhibiting a kind of phylogenetic snobbery [which led them] to think that Darwin had libeled the [human] race by discovering simian rather than seraphic ancestors."

such a theory" would be grounds for dismissal and for prosecution under the statute; and he said "that the Supreme Court of Arkansas' opinion should be interpreted in that manner." He said: "If Mrs. Epperson would tell her students that 'Here is Darwin's theory, that man ascended or descended from a lower form of being,' then I think she would be under this statute liable for prosecution."

In any event, we do not rest our decision upon the asserted vagueness of the statute. On either interpretation of its language, Arkansas' statute cannot stand. It is of no moment whether the law is deemed to prohibit mention of Darwin's theory, or to forbid any or all of the infinite varieties of communication embraced within the term "teaching." Under either interpretation, the law must be stricken because of its conflict with the constitutional prohibition of state laws respecting an establishment of religion or prohibiting the free exercise thereof. The overriding fact is that Arkansas' law selects from the body of knowledge a particular segment which it proscribes for the sole reason that it is deemed to conflict with a particular religious doctrine; that is, with a particular interpretation of the Book of Genesis by a particular religious group.[11]

### III.

The antecedents of today's decision are many and unmistakable. They are rooted in the foundation soil of our Nation. They are fundamental to freedom.

Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine,

---

[11] In *Scopes* v. *State*, 154 Tenn. 105, 126, 289 S. W. 363, 369 (1927), Judge Chambliss, concurring, referred to the defense contention that Tennessee's anti-evolution law gives a "preference" to "religious establishments which have as one of their tenets or dogmas the instantaneous creation of man."

and practice. It may not be hostile to any religion or to the advocacy of no-religion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite. The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.[12]

As early as 1872, this Court said: "The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." *Watson* v. *Jones,* 13 Wall. 679, 728. This has been the interpretation of the great First Amendment which this Court has applied in the many and subtle problems which the ferment of our national life has presented for decision within the Amendment's broad command.

Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. Our courts, however, have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief. By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values.[13] On the other hand, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," *Shelton* v. *Tucker,* 364 U. S. 479, 487 (1960). As this

[12] *Everson* v. *Board of Education,* 330 U. S. 1, 18 (1947); *McCollum* v. *Board of Education,* 333 U. S. 203 (1948); *Zorach* v. *Clauson,* 343 U. S. 306, 313–314 (1952); *Fowler* v. *Rhode Island,* 345 U. S. 67 (1953); *Torcaso* v. *Watkins,* 367 U. S. 488, 495 (1961).

[13] See the discussion in Developments in The Law—Academic Freedom, 81 Harv. L. Rev. 1045, 1051–1055 (1968).

Court said in *Keyishian* v. *Board of Regents,* the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." 385 U. S. 589, 603 (1967).

The earliest cases in this Court on the subject of the impact of constitutional guarantees upon the classroom were decided before the Court expressly applied the specific prohibitions of the First Amendment to the States. But as early as 1923, the Court did not hesitate to condemn under the Due Process Clause "arbitrary" restrictions upon the freedom of teachers to teach and of students to learn. In that year, the Court, in an opinion by Justice McReynolds, held unconstitutional an Act of the State of Nebraska making it a crime to teach any subject in any language other than English to pupils who had not passed the eighth grade.[14] The State's purpose in enacting the law was to promote civic cohesiveness by encouraging the learning of English and to combat the "baneful effect" of permitting foreigners to rear and educate their children in the language of the parents' native land. The Court recognized these purposes, and it acknowledged the State's power to prescribe the school curriculum, but it held that these were not adequate to support the restriction upon the liberty of teacher and pupil. The challenged statute, it held, unconstitutionally interfered with the right of the individual, guaranteed by the Due Process Clause, to engage in any of the common occupations of life and to acquire useful knowledge. *Meyer* v. *Nebraska,* 262 U. S. 390 (1923). See also *Bartels* v. *Iowa,* 262 U. S. 404 (1923).

For purposes of the present case, we need not re-enter the difficult terrain which the Court, in 1923, traversed without apparent misgivings. We need not take advantage of the broad premise which the Court's decision

---

[14] The case involved a conviction for teaching "the subject of reading in the German language" to a child of 10 years.

in *Meyer* furnishes, nor need we explore the implications of that decision in terms of the justiciability of the multitude of controversies that beset our campuses today. Today's problem is capable of resolution in the narrower terms of the First Amendment's prohibition of laws respecting an establishment of religion or prohibiting the free exercise thereof.

There is and can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma. In *Everson* v. *Board of Education,* this Court, in upholding a state law to provide free bus service to school children, including those attending parochial schools, said: "Neither [a State nor the Federal Government] can pass laws which aid one religion, aid all religions, or prefer one religion over another." 330 U. S. 1, 15 (1947).

At the following Term of Court, in *McCollum* v. *Board of Education,* 333 U. S. 203 (1948), the Court held that Illinois could not release pupils from class to attend classes of instruction in the school buildings in the religion of their choice. This, it said, would involve the State in using tax-supported property for religious purposes, thereby breaching the "wall of separation" which, according to Jefferson, the First Amendment was intended to erect between church and state. *Id.,* at 211. See also *Engel* v. *Vitale,* 370 U. S. 421 (1962); *Abington School District* v. *Schempp,* 374 U. S. 203 (1963). While study of religions and of the Bible from a literary and historic viewpoint, presented objectively as part of a secular program of education, need not collide with the First Amendment's prohibition, the State may not adopt programs or practices in its public schools or colleges which "aid or oppose" any religion. *Id.,* at 225. This prohibition is absolute. It forbids alike the preference of a religious doctrine or the prohibition

of theory which is deemed antagonistic to a particular dogma. As Mr. Justice Clark stated in *Joseph Burstyn, Inc.* v. *Wilson,* "the state has no legitimate interest in protecting any or all religions from views distasteful to them . . . ." 343 U. S. 495, 505 (1952). The test was stated as follows in *Abington School District* v. *Schempp, supra,* at 222: "[W]hat are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution."

These precedents inevitably determine the result in the present case. The State's undoubted right to prescribe the curriculum for its public schools does not carry with it the right to prohibit, on pain of criminal penalty, the teaching of a scientific theory or doctrine where that prohibition is based upon reasons that violate the First Amendment. It is much too late to argue that the State may impose upon the teachers in its schools any conditions that it chooses, however restrictive they may be of constitutional guarantees. *Keyishian* v. *Board of Regents,* 385 U. S. 589, 605–606 (1967).

In the present case, there can be no doubt that Arkansas has sought to prevent its teachers from discussing the theory of evolution because it is contrary to the belief of some that the Book of Genesis must be the exclusive source of doctrine as to the origin of man. No suggestion has been made that Arkansas' law may be justified by considerations of state policy other than the religious views of some of its citizens.[15] It is clear

---

[15] Former Dean Leflar of the University of Arkansas School of Law has stated that "the same ideological considerations underlie the anti-evolution enactment" as underlie the typical blasphemy statute. He says that the purpose of these statutes is an "ideological" one which "involves an effort to prevent (by censorship) or punish the presentation of intellectually significant matter which

that fundamentalist sectarian conviction was and is the law's reason for existence.[16] Its antecedent, Tennessee's "monkey law," candidly stated its purpose: to make it unlawful "to teach any theory that denies the story of the Divine Creation of man as taught in the Bible, and to teach instead that man has descended from a

---

contradicts accepted social, moral or religious ideas." Leflar, Legal Liability for the Exercise of Free Speech, 10 Ark. L. Rev. 155, 158 (1956). See also R. Hofstadter & W. Metzger, The Development of Academic Freedom in the United States 320–366 (1955) (*passim*); H. Beale, A History of Freedom of Teaching in American Schools 202–207 (1941); Emerson & Haber, The *Scopes* Case in Modern Dress, 27 U. Chi. L. Rev. 522 (1960); Waller, The Constitutionality of the Tennessee Anti-Evolution Act, 35 Yale L. J. 191 (1925) (*passim*); ACLU, The Gag on Teaching 7 (2d ed., 1937); J. Scopes & J. Presley, Center of the Storm 45–53 (1967).

[16] The following advertisement is typical of the public appeal which was used in the campaign to secure adoption of the statute:

"THE BIBLE OR ATHEISM, WHICH?

"All atheists favor evolution. If you agree with atheism vote against Act No. 1. If you agree with the Bible vote for Act No. 1. . . . Shall conscientious church members be forced to pay taxes to support teachers to teach evolution which will undermine the faith of their children? The Gazette said Russian Bolshevists laughed at Tennessee. True, and that sort will laugh at Arkansas. Who cares? Vote FOR ACT NO. 1." The Arkansas Gazette, Little Rock, Nov. 4, 1928, p. 12, cols. 4–5.

Letters from the public expressed the fear that teaching of evolution would be "subversive of Christianity," id., Oct. 24, 1928, p. 7, col. 2; see also id., Nov. 4, 1928, p. 19, col. 4; and that it would cause school children "to disrespect the Bible," id., Oct. 27, 1928, p. 15, col. 5. One letter read: "The cosmogony taught by [evolution] runs contrary to that of Moses and Jesus, and as such is nothing, if anything at all, but atheism. . . . Now let the mothers and fathers of our state that are trying to raise their children in the Christian faith arise in their might and vote for this anti-evolution bill that will take it out of our tax supported schools. When they have saved the children, they have saved the state." Id., at cols. 4–5.

lower order of animals." [17]   Perhaps the sensational publicity attendant upon the *Scopes* trial induced Arkansas to adopt less explicit language.[18]   It eliminated Tennessee's reference to "the story of the Divine Creation of man" as taught in the Bible, but there is no doubt that the motivation for the law was the same: to suppress the teaching of a theory which, it was thought, "denied" the divine creation of man.

Arkansas' law cannot be defended as an act of religious neutrality.   Arkansas did not seek to excise from the curricula of its schools and universities all discussion of the origin of man.   The law's effort was confined to an attempt to blot out a particular theory because of its supposed conflict with the Biblical account, literally read. Plainly, the law is contrary to the mandate of the First, and in violation of the Fourteenth, Amendment to the Constitution.

The judgment of the Supreme Court of Arkansas is

*Reversed.*

Mr. Justice Black, concurring.

I am by no means sure that this case presents a genuinely justiciable case or controversy.   Although Arkansas Initiated Act No. 1, the statute alleged to be unconstitutional, was passed by the voters of Arkansas in 1928, we are informed that there has never been even a single attempt by the State to enforce it.   And the pallid, unenthusiastic, even apologetic defense of the Act presented by the State in this Court indicates that the State would make no attempt to enforce the law

---

[17] Arkansas' law was adopted by popular initiative in 1928, three years after Tennessee's law was enacted and one year after the Tennessee Supreme Court's decision in the *Scopes* case, *supra.*

[18] In its brief, the State says that the Arkansas statute was passed with the holding of the *Scopes* case in mind.   Brief for Appellee 1.

should it remain on the books for the next century. Now, nearly 40 years after the law has slumbered on the books as though dead, a teacher alleging fear that the. State might arouse from its lethargy and try to punish her has asked for a declaratory judgment holding the law unconstitutional. She was subsequently joined by a parent who alleged his interest in seeing that his two then school-age sons "be informed of all scientific theories and hypotheses . . . ." But whether this Arkansas teacher is still a teacher, fearful of punishment under the Act, we do not know. It may be, as has been published in the daily press, that she has long since given up her job as a teacher and moved to a distant city, thereby escaping the dangers she had imagined might befall her under this lifeless Arkansas Act. And there is not one iota of concrete evidence to show that the parent-intervenor's sons have not been or will not be taught about evolution. The textbook adopted for use in biology classes in Little Rock includes an entire chapter dealing with evolution. There is no evidence that this chapter is not being freely taught in the schools that use the textbook and no evidence that the intervenor's sons, who were 15 and 17 years old when this suit was brought three years ago, are still in high school or yet to take biology. Unfortunately, however, the State's languid interest in the case has not prompted it to keep this Court informed concerning facts that might easily justify dismissal of this alleged lawsuit as moot or as lacking the qualities of a genuine case or controversy.

Notwithstanding my own doubts as to whether the case presents a justiciable controversy, the Court brushes aside these doubts and leaps headlong into the middle of the very broad problems involved in federal intrusion into state powers to decide what subjects and schoolbooks it may wish to use in teaching state pupils. While I hesitate to enter into the consideration and deci-

sion of such sensitive state-federal relationships, I reluctantly acquiesce. But, agreeing to consider this as a genuine case or controversy, I cannot agree to thrust the Federal Government's long arm the least bit further into state school curriculums than decision of this particular case requires. And the Court, in order to invalidate the Arkansas law as a violation of the First Amendment, has been compelled to give the State's law a broader meaning than the State Supreme Court was willing to give it. The Arkansas Supreme Court's opinion, in its entirety, stated that:

> "Upon the principal issue, that of constitutionality, the court holds that Initiated Measure No. 1 of 1928, Ark. Stat. Ann. § 80–1627 and § 80–1628 (Repl. 1960), is a valid exercise of the state's power to specify the curriculum in its public schools. The court expresses no opinion on the question whether the Act prohibits any explanation of the theory of evolution or merely prohibits teaching that the theory is true; the answer not being necessary to a decision in the case, and the issue not having been raised."

It is plain that a state law prohibiting all teaching of human development or biology is constitutionally quite different from a law that compels a teacher to teach as true only one theory of a given doctrine. It would be difficult to make a First Amendment case out of a state law eliminating the subject of higher mathematics, or astronomy, or biology from its curriculum. And, for all the Supreme Court of Arkansas has said, this particular Act may prohibit that and nothing else. This Court, however, treats the Arkansas Act as though it made it a misdemeanor to teach or to use a book that teaches that evolution is true. But it is not for this Court to arrogate to itself the power to determine the scope of Arkansas statutes. Since the highest court of

Arkansas has deliberately refused to give its statute that meaning, we should not presume to do so.

It seems to me that in this situation the statute is too vague for us to strike it down on any ground but that: vagueness. Under this statute as construed by the Arkansas Supreme Court, a teacher cannot know whether he is forbidden to mention Darwin's theory at all or only free to discuss it as long as he refrains from contending that it is true. It is an established rule that a statute which leaves an ordinary man so doubtful about its meaning that he cannot know when he has violated it denies him the first essential of due process. See, *e. g.*, *Connally* v. *General Construction Co.*, 269 U. S. 385, 391 (1926). Holding the statute too vague to enforce would not only follow long-standing constitutional precedents but it would avoid having this Court take unto itself the duty of a State's highest court to interpret and mark the boundaries of the State's laws. And, more important, it would not place this Court in the unenviable position of violating the principle of leaving the States absolutely free to choose their own curriculums for their own schools so long as their action does not palpably conflict with a clear constitutional command.

The Court, not content to strike down this Arkansas Act on the unchallengeable ground of its plain vagueness, chooses rather to invalidate it as a violation of the Establishment of Religion Clause of the First Amendment. I would not decide this case on such a sweeping ground for the following reasons, among others.

1. In the first place I find it difficult to agree with the Court's statement that "there can be no doubt that Arkansas has sought to prevent its teachers from discussing the theory of evolution because it is contrary to the belief of some that the Book of Genesis must be the exclusive source of doctrine as to the origin of man." It may be instead that the people's motive was merely that it would be best to remove this contro-

versial subject from its schools; there is no reason I can imagine why a State is without power to withdraw from its curriculum any subject deemed too emotional and controversial for its public schools. And this Court has consistently held that it is not for us to invalidate a statute because of our views that the "motives" behind its passage were improper; it is simply too difficult to determine what those motives were. See, *e. g., United States* v. *O'Brien,* 391 U. S. 367, 382–383 (1968).

2. A second question that arises for me is whether this Court's decision forbidding a State to exclude the subject of evolution from its schools infringes the religious freedom of those who consider evolution an anti-religious doctrine. If the theory is considered anti-religious, as the Court indicates, how can the State be bound by the Federal Constitution to permit its teachers to advocate such an "anti-religious" doctrine to schoolchildren? The very cases cited by the Court as supporting its conclusion hold that the State must be neutral, not favoring one religious or anti-religious view over another. The Darwinian theory is said to challenge the Bible's story of creation; so too have some of those who believe in the Bible, along with many others, challenged the Darwinian theory. Since there is no indication that the literal Biblical doctrine of the origin of man is included in the curriculum of Arkansas schools, does not the removal of the subject of evolution leave the State in a neutral position toward these supposedly competing religious and anti-religious doctrines? Unless this Court is prepared simply to write off as pure nonsense the views of those who consider evolution an anti-religious doctrine, then this issue presents problems under the Establishment Clause far more troublesome than are discussed in the Court's opinion.

3. I am also not ready to hold that a person hired to teach school children takes with him into the classroom a constitutional right to teach sociological, economic,

political, or religious subjects that the school's managers do not want discussed. This Court has said that the rights of free speech "while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time." *Cox* v. *Louisiana,* 379 U. S. 536, 554; *Cox* v. *Louisiana,* 379 U. S. 559, 574. I question whether it is absolutely certain, as the Court's opinion indicates, that "academic freedom" permits a teacher to breach his contractual agreement to teach only the subjects designated by the school authorities who hired him.

Certainly the Darwinian theory, precisely like the Genesis story of the creation of man, is not above challenge. In fact the Darwinian theory has not merely been criticized by religionists but by scientists, and perhaps no scientist would be willing to take an oath and swear that everything announced in the Darwinian theory is unquestionably true. The Court, it seems to me, makes a serious mistake in bypassing the plain, unconstitutional vagueness of this statute in order to reach out and decide this troublesome, to me, First Amendment question. However wise this Court may be or may become hereafter, it is doubtful that, sitting in Washington, it can successfully supervise and censor the curriculum of every public school in every hamlet and city in the United States. I doubt that our wisdom is so nearly infallible.

I would either strike down the Arkansas Act as too vague to enforce, or remand to the State Supreme Court for clarification of its holding and opinion.

Mr. Justice Harlan, concurring.

I think it deplorable that this case should have come to us with such an opaque opinion by the State's highest court. With all respect, that court's handling of the

case savors of a studied effort to avoid coming to grips with this anachronistic statute and to "pass the buck" to this Court. This sort of temporizing does not make for healthy operations between the state and federal judiciaries. Despite these observations, I am in agreement with this Court's opinion that, the constitutional claims having been properly raised and necessarily decided below, resolution of the matter by us cannot properly be avoided.* See, *e. g., Chicago Life Insurance Co.* v. *Needles,* 113 U. S. 574, 579 (1885).

I concur in so much of the Court's opinion as holds that the Arkansas statute constitutes an "establishment of religion" forbidden to the States by the Fourteenth Amendment. I do not understand, however, why the Court finds it necessary to explore at length appellants' contentions that the statute is unconstitutionally vague and that it interferes with free speech, only to conclude that these issues need not be decided in this case. In the process of *not* deciding them, the Court obscures its otherwise straightforward holding, and opens its opinion to possible implications from which I am constrained to disassociate myself.

MR. JUSTICE STEWART, concurring in the result.

The States are most assuredly free "to choose their own curriculums for their own schools." A State is en-

---

*Short of reading the Arkansas Supreme Court's opinion to have proceeded on the premise that it need not consider appellants' "establishment" contention, clearly raised in the state courts and here, in view of its holding that the State possesses plenary power to fix the curriculum in its public schools, I can perceive no tenable basis for remanding the case to the state court for an explication of the purpose and meaning of the statute in question. I am unwilling to ascribe to the Arkansas Supreme Court any such quixotic approach to constitutional adjudication. I take the first sentence of its opinion (*ante,* at 101, n. 7) to encompass an overruling of appellants' "establishment" point, and the second sentence to refer only to their "vagueness" claim.

tirely free, for example, to decide that the only foreign language to be taught in its public school system shall be Spanish. But would a State be constitutionally free to ·punish a teacher for letting his students know that other languages are also spoken in the world? I think not.

It is one thing for a State to determine that "the subject of higher mathematics, or astronomy, or biology" shall or shall not be included in its public school curriculum. It is quite another thing for a State to make it a criminal offense for a public school teacher so much as to mention the very existence of an entire system of respected human thought. That kind of criminal law, I think, would clearly impinge upon the guarantees of free communication contained in the First Amendment, and made applicable to the States by the Fourteenth.

The Arkansas Supreme Court has said that the statute before us may or may not be just such a law. The result, as MR. JUSTICE BLACK points out, is that "a teacher cannot know whether he is forbidden to mention Darwin's theory at all." Since I believe that no State could constitutionally forbid a teacher "to mention Darwin's theory at all," and since Arkansas may, or may not, have done just that, I conclude that the statute before us is so vague as to be invalid under the Fourteenth Amendment. See *Cramp* v. *Board of Pub. Instruction,* 368 U. S. 278.