**Thomas ROSE et al.**

v.

**The NASHUA BOARD OF EDUCATION and its Members et al.**

Civ. No. 80–587–D.

United States District Court, D. New Hampshire.

Feb. 4, 1981.

Kris E. Durmer, Nashua, N. H., for plaintiffs.

H. Philip Howorth, Corp. Counsel, Nashua, N. H., for defendants.

## OPINION AND ORDER

DEVINE, Chief Judge.

The instant action involves the extent of the power of a local board of education to suspend a school bus route for reasons of safety or when acts of vandalism have been reported. Transportation for integration of education is not involved—less than one percent of the population of New Hampshire has skin pigmentation of a color other than white.

Plaintiffs are a group of parents and their children who attend the Nashua public schools, while defendants are the Nashua Board of Education ("Board"), its members, and its superintendent. The litigation is cast in the nature of a civil rights action, 42 U.S.C. § 1983, with jurisdiction invoked pur-

suant to 28 U.S.C. § 1343(3), (4), and a suggestion also of pendent jurisdiction. The relief sought is injunctive, Rule 65, Federal Rules of Civil Procedure, and declaratory, 28 U.S.C. §§ 2201, 2202, in nature.

Pursuant to the provisions of Rule 65(a)(2), the Court has held a hearing on the merits of the litigation and has allowed the filing of legal memos in behalf of the respective parties. Having reviewed the evidence, exhibits, pleadings, legal memos, and other documents on file, the Court now proceeds with disposition of the matter.

### THE FACTS

Pursuant to its statutory mandate,[1] the Nashua Board of Education provides transportation by bus to its schools for all elementary students (defined as those in grades 1 through 6) who reside one mile or more from their respective schools, and for all secondary students (defined as grades 7 through 12) who reside two miles or more from their respective schools. The transportation is free to those students through the ninth grade, and students in the tenth through twelfth grades who desire such transportation must pay for same. At all pertinent times the bus transportation has been provided by Jan-Car Leasing Corporation of Nashua ("Jan-Car") pursuant to a contract between it and the Board. (Defendants' Exhibit C.)

Adolescent behavior being what it is, Jan-Car received complaints from its drivers of acts of vandalism and the throwing of objects, which the drivers perceived impinged upon the safety of their operation of the school buses. In December 1978 a proposal was therefore made to the Board whereby a bus route might be temporarily suspended for disciplinary purposes, but, at the request of defendant Alan Thomaier, a member of the Board, this was referred to a committee. At the time Thomaier felt the policy to be somewhat harsh, as innocent students would be deprived of bus transportation along with the guilty, and he thought that the installation of cameras in the buses

might prove to be a feasible alternative. (Plaintiffs' Exhibit 3A.) The resolution came again before the Board in February of 1979 (Plaintiffs' Exhibit 3B), but final action was again deferred. On October 25, 1979, Pasquale Alosa, the principal of Jan-Car, and six of his bus drivers appeared before the Board and outlined the disciplinary problems which fell generally into the category of "disrespect for driver, excessive noise, throwing of objects such as pencils or acorns, and, for some of the buses, cutting of seats". (Plaintiffs' Exhibit 3C, p. 1.) The drivers pointed out that as they were required to watch the road, they were unable to identify the students involved in these incidents, and unless guilt were admitted or other students assisted, discipline could not be enforced. (*Id.*) Accordingly, it was then recommended that a suspension policy be adopted, and such policy was again discussed and approved at a subsequent meeting on October 29, 1979. (Plaintiffs' Exhibit 3D.)

Richard Coutoumas, transportation director for the Nashua Board of Education, testified that there are 150 routes each morning and each afternoon, or 300 routes per day, for each of the 180 required school days, for a total of 54,000 individual bus routes. In the period subsequent to the enactment of the school bus suspension policy, specifically between December 3, 1979, and December 1, 1980, 12 such routes have been suspended.[2] Of these 12 suspensions, 10 were for vandalism, and 2 were for safety. In no instance was any suspension in excess of five days.

The safety suspensions were instigated by Alosa acting on his own authority. The first of these occurred on route 59 (a junior high school route), where allegedly on the homeward afternoon trip of October 15, 1980, certain students in the rear of the bus lit paper airplanes or balls of paper and threw them at other students. The resulting suspension was for the period Friday, October 17, 1980, through Thursday, October 22, 1980.

---

1. New Hampshire Revised Statutes Annotated Chapter 189, Sections 6 through 9-a.

2. Six of such routes were senior high school (grades 10 through 12), and six such routes were junior high school (grades 7 through 9).

The second safety suspension on route 39 (a senior high school route) occurred on the homeward trip of November 24, 1980, when students on the bus allegedly threw a snowball or piece of ice therefrom and broke the windshield of a passing automobile. Suspension of this route was effective Monday, December 1 through Friday, December 5, 1980.

Of the ten acts of vandalism documented in the testimony of Coutoumas and Alosa and in the written record (Plaintiffs' Exhibits 4, 6C, 7), the most common pattern of damage appeared to be the slashing of seats, with property damage ranging from $60 to $400. It appears that in each instance an assistant principal or teacher would board the bus and advise the students of the impending suspension and that this would be followed up with a written notice from Coutoumas to the parents of all "eligible"[3] students on the respective bus route advising such parents of the impending dates of suspension and the fact that such suspension would be effected if the guilty parties did not come forward before such date.[4]

Plaintiff Patricia Rose, daughter of plaintiffs Thomas and Bette Rose, is a junior high school student who was aboard route 63 when it was suspended as the result of the slashing of several seats (Plaintiffs' Exhibit 7). The seats which were damaged were near the rear of the bus, and Miss Rose testified she was seated near the middle and did not observe the acts of vandalism, but that if she had known the identity of those students who had caused such damage, she would have reported it to the proper authorities. As the result of the suspension of her route for five school days, she was required either to walk or be furnished transportation by her parents. Her mother, Bette Rose, testified that she had transported her daughter to junior high school at great inconvenience,[5] and she objected to the policy whereby the innocent school bus riders were punished by being deprived of bus transportation for the acts of a very few miscreants.[6]

Accordingly, Mrs. Rose and other interested parents appeared before subsequent meetings of the transportation committee of the Board in September and October of 1980. Alternatives to the suspension of bus routes discussed at such meetings included seat assignments, photo ID passes, in-bus monitors, and/or cameras (Plaintiffs' Exhibits 3E, 3F).

Testimony from additional of the minor plaintiffs and offers of proof stipulated to by defendants' counsel were to the same effect, i. e., in almost every instance,[7] the student bus passenger did not observe the action which led to the suspension and was innocent of participation therein, and it was inconvenient and/or of some expense to the parents to provide substitute transportation during the period of suspension.

## I. *Procedural Due Process.*

The first question we address in a claim of the denial of procedural due process is

---

3. "Eligible" students included all of those within the proscribed distances from their assigned schools. Some students apparently do not use the buses, and arrive at school either on foot or through use of other transportation.

4. Plaintiffs' Exhibits 5, 6A, 6C *, and 7 contain examples of the letters forwarded to parents dealing with the respective suspensions.
    * The identification is herewith stricken from Plaintiffs' Exhibit 6C, as it is found and ruled by the Court to consist of records kept in the usual course of business by Richard Coutoumas and to which he testified in detail during the course of trial. Such records are therefore clearly admissible.

5. As is not ususual in this inflationary age, both Mrs. Rose and her husband are gainfully employed during the day. While Mrs. Rose works in the Nashua area, her husband's place of employment is some 40 miles away, and it would be physically impossible for him to furnish transportation to school for their children.

6. Both Coutoumas and Lawrence O'Mara, the acting superintendent, estimated that ten percent or less of the entire student bus-riding population were responsible for the actions which gave rise to the bus suspension policy.

7. One student did testify that she observed those responsible for lighting the fireballs on the bus, but that she was unable to give this information to the authorities before the suspension took effect, although she would have been willing to divulge such information.

whether plaintiff has a legitimate claim of entitlement to an interest protected by due process. If so, the next inquiry must be whether plaintiff was deprived of that property or liberty interest without due process, which necessarily encompasses the question of what process is due.

It is now well settled that the requirements of procedural due process have application only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property, and that the range of the interests protected by procedural due process is not infinite. *Board of Regents v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). To have a property interest in a benefit, one clearly must have more than an abstract need or desire for or a unilateral expectation of it, and must rather have a legitimate claim of entitlement to it. *Id.* at 577, 92 S.Ct. at 2709. Property interests

> are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709.

Commencing in 1878, New Hampshire, as subsequently have many other states,[8] provided for transportation of school children by an appropriation of not more than ten percent of school monies for such transport. *State v. Hall,* 74 N.H. 61, 64 A. 1102 (1906). Originally considered to be discretionary, *Fogg v. Board of Education,* 76 N.H. 296, 82 A. 173 (1912); *Berry v. School Board,* 78 N.H. 30, 95 A. 952 (1915), it is now clear that such provisions are mandatory. *Wiswell v. Pembroke School District,* 115 N.H. 655, 348 A.2d 347 (1975).

Thus, school districts must furnish transportation to all pupils below the ninth grade living more than two miles from the school to which they are assigned, N.H. RSA 189:6, and such transportation is to be furnished to all pupils under the age of fourteen years in grades above the eighth. N.H. RSA 189:7. Pupils who are entitled to transportation may be required to walk a distance not exceeding one and one-half miles to an established transportation or school bus line, or one mile to other transportation. N.H. RSA 189:8.

It is accordingly clear that suspension of a school bus route implicates a protectible property interest and that the next question presented is what process is due to protect against an erroneous deprivation of that interest. The New Hampshire statute provides as to discipline, N.H. RSA 189:9–a:

> Notwithstanding the provisions of RSA 189:6–8, the superintendent, or his representative as designated in writing, is authorized to suspend the right of pupils from riding in a school bus when said pupils fail to conform to the reasonable rules and regulations as may be promulgated by the school board. Any suspension to continue beyond 20 school days must be approved by the school board. Said suspension shall not begin until the next school day following the day notification of suspension is sent to the pupil's parent or legal guardian.
>
> I. If a pupil has been denied the right to ride a school bus for disciplinary reasons, the parent or guardian of that pupil has a right of appeal within 10 days of suspension to the authority that suspended this pupil's right.
>
> II. Until the appeal is heard, or if the suspension of pupil's right to ride the school bus is upheld, it shall be the parents' or guardians' responsibility to provide transportation to and from school for that pupil for the period of the suspension.

Resolution of our inquiry as to the process due these plaintiffs requires that we consider (1) the private interests that will be affected by the official action; (2) the risk of an erroneous deprivation of such interests through the procedures, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interests, including the function involved and the fiscal and administra-

---

8.  *See* Annot., 52 A.L.R.3d 1036.

tive burden that the additional or substitute procedural requirement would entail. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). *See also Mackey v. Montrym,* 443 U.S. 1, 10, 99 S.Ct. 2612, 2617, 61 L.Ed.2d 321 (1979); *Parham v. J. R.,* 442 U.S. 584, 599–600, 99 S.Ct. 2493, 2502–2503, 61 L.Ed.2d 101 (1979).

On January 5, 1981, while the instant action was pending but before hearing thereon, the Board adopted a detailed "transportation handbook" (Defendants' Exhibit B), setting forth the rules and regulations governing the conduct of students on school buses. *Inter alia,* the director of transportation was authorized in the case of serious violation of the rules and regulations set forth, when every effort to determine those responsible had failed, to report the violation to the transportation committee of the Board of Education for the recommendation of further action to be taken, and a copy of his report is to be furnished to the parents of students who ride the bus route. (*Id.* 443 U.S. at p. 8, 99 S.Ct. at p. 2616.) Upon receipt of such report, the transportation committee was to meet to consider it and alternatively to ask individual student riders to report what they have observed (as required under ¶ D of the regulations), issue individual seat assignments, issue identification cards, or engage special police to ride the route. *Id.* at p. 8, 99 S.Ct. at p. 2616. If after taking such of these steps as

> it deems necessary or appropriate, the Transportation Committee finds that the violations of Rules and Regulations continue to be detrimental to the safety of persons and property on the bus route,

they may after giving written notice to the parents of the bus riders on the route, without further vote of the Board of Education, suspend the bus route temporarily commencing not earlier than five calendar days from the date of notice to the parents. A bus may not be temporarily suspended for more than five days without a vote of the full Board of Education.

*Id.* at p. 8, 99 S.Ct. at p. 2616.[9] Although nothing in the current or previous school bus suspension regulation bars exercise of the right of plaintiffs to an appeal as mandated by N.H. RSA 189:9–a—and here such right of appeal was exercised, albeit unsuccessfully, by plaintiff Bette Rose—the plaintiffs urge that their property interest is of such nature as to mandate that any hearing must be held before suspension of the bus route, regardless of the danger to the safety of the driver or bus passengers or the extent of damage to the bus.[10] Examination of the balancing process mandated by *Mathews v. Eldridge, supra,* and its progeny indicates that we must first identify the nature and weight of the private interest affected by the official action challenged. Here, in twelve months we have had twelve suspensions of 54,000 bus routes, two of which entailed significant safety considerations, and ten of which involved non-minimal property damage. However substantial the interests of the parents and student bus riders in transport by the Board may be, it is clear that the duration of any potentially wrongful deprivation of the property interest is similarly an important factor in assessing the impact of official action on the private interest involved. *Mackey v. Montrym, supra,* 443 U.S. at 12,

---

9. The previous policy providing for *temporary* suspension of a bus route which was in effect at the time of the incidents outlined in the testimony of the witnesses is set forth in Defendants' Exhibit A as follows:

> The Director of Transportation, in consultation with the Superintendent of Schools and the appropriate building principal, may temporarily suspend a bus route when other measures to bring about corrective action have not been successful. It is recognized that the suspension of a bus route is a serious step and may be taken only after other measures have proven unsuccessful and parents

have been alerted to the possibility of this step.

> A bus route may be temporarily suspended for a period of up to five days.

10. At one point plaintiff Bette Rose testified to the effect that she could think of no circumstances under which a bus route could or should be suspended without a presuspension hearing. The Court respectfully disagrees, being satisfied that the incidences outlined in the statement of facts relative to the two safety suspensions ordered by Mr. Alosa are clearly of such type as to warrant immediate suspension without hearing.

99 S.Ct. at 2618. In no instance here was such route suspension in excess of five days, and it does not appear that any such is contemplated, for, as the statute (N.H. RSA 189:9–a) requires, lengthy suspensions must be approved by the Board.

Turning then to the minimization of the risk of erroneous decision, we consider the likelihood of an erroneous deprivation of the private interests involved as a consequence of the procedures used. This is of more importance in the context of this case, for those students innocent of wrongdoing suffer the same penalty as do the culprits. But where, as here provided by statute (N.H. RSA 189:9–a), prompt post-deprivation review is available for correction of administrative error, the law requires no more than that the pre-deprivation procedures used be designed to provide a reasonably reliable basis for concluding that the facts justifying the official action are as a responsible governmental official warrants them to be. *Mackey v. Montrym, supra,* at 13, 99 S.Ct. at 2618. Certainly no driver should be forced to continue to operate a bus where someone is throwing snow or ice or flaming paper, and a bus operator is entitled to a determination of the responsibility of one who damages his property. Considering the rare number of suspensions and the testimony of Coutoumas and Alosa to the effect that these suspensions have improved the discipline on the buses, we are not persuaded that the risk of inherent error is such as to mandate a pre-suspension hearing under the circumstances which have been outlined in this litigation. Additionally, identification of a governmental function, *i. e.,* the safe and expeditious transportation of students to and from school, requires also that we weigh in the balance the state interests served by the summary procedures, as well as the admin-

istrative and fiscal burdens, if any, that would result from the substitute procedures sought. *Mackey v. Montrym, supra,* 443 U.S. at 17, 99 S.Ct. at 2620. The evidence presented to the Court in this regard was to the effect that cameras (originally desired by Board member Thomaier) were not practical because of the high seats in the bus which would prevent their efficient use; that seating assignments and photo ID passes were similarly impractical because of the time limitations required in the operation of the bus route; [11] and that although monitors when used have been successful, cost prohibits their use in each instance.[12]

In short, there is no rigid rule that requires a hearing before suspension of bus routes based on the evidence presented to the Court. In many instances, requirements of swift and effective governmental action preclude such hearing until after the suspension has been effected. *See Rodriguez de Quinonez v. Perez,* 596 F.2d 486 (1st Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979); *Levesque v. State of Maine,* 587 F.2d 78 (1st Cir. 1978). Accordingly, the Court concludes that the compelling interest in safety of the bus operator and student riders and in the prevention of vandalism justifies the Board in making summary suspension effective pending the outcome of the prompt appeal mandated by the statute.

## II. *Substantive Due Process.*

The appropriate test of determining whether the suspension prior to hearing and its application deprived students' parents and bus riders of due process is as set forth in *Cook v. Edwards,* 341 F.Supp. 307 (D.N.H.1972). That test requires that we weigh the severity of the punitive effect of the suspension against the severity of the conduct which occasioned the suspension. *Id.*

---

**11.** Each driver for Jan-Car drives three separate routes each morning and each afternoon, and must therefore load and unload quickly to get all students to school on time. It is doubtful that either the students or their parents would be amenable to earlier boarding for the passage to and later return hours for the passage from school, which would be the case were seat assignments or photo identification cards necessary.

**12.** When monitors were used, a substitute driver was paid to fill this position. The cost of monitors on each route was estimated by one witness to be up to $100,000, and in light of the minimal number of suspensions, it is doubtful that the taxpayers would accede to this additional burden.

*See Knight v. Board of Education,* 38 Ill. App.3d 603, 348 N.E.2d 299 (1976).

There are generally two categories of rules provided for the discipline of students. One category provides punishment which must fit the misbehavior and be tailored to the pupil's age, intelligence, and personal history. The second category includes rules which decree consistency in the punishment of certain misbehavior in all pupils. *Mitchell v. Board of Trustees of Oxford, etc.,* 625 F.2d 660, 663 (5th Cir. 1980) (due process rights not violated by application to students of school board rule which mandated the automatic expulsion of any student who brought a knife or other weapon on school property). In the first category, punishment is tailored to fit the crime, but in the second category, the rules are mandatory and represent the school administration's response to certain articulable and well-defined problems. *Id.*

> These rules tell the students that if misbehavior A occurs, punishment B will follow. *See e. g., Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (the use or possession of intoxicating beverages at school shall be punished by suspension for the balance of the semester); *Caldwell v. Cannady,* 340 F.Supp. 835 (N.D.Tex.1972) (school altered a rule which gave the school board discretion to expel a student who uses, sells or possesses a dangerous drug to a rule which required expulsion in such cases); *Fielder v. Board of Education,* 346 F.Supp. 722 (D.Neb.1972) (in an effort to reduce tardiness and absenteeism, the school set up a very specific schedule of punishment).

*Mitchell v. Board of Trustees of Oxford, etc., supra,* 625 F.2d at 663.

The Board in the instant case has adopted a rule in the mandatory category which is designed to insure the safety of those who ride its buses and to prevent damage to said buses. It is without question that the Board has the right, power, and duty to make and enforce such rule, and its response here the Court finds and rules is consistent and simple to apply. As we have had occasion to previously point out, apart from interference with First Amendment freedoms, judicial interposition in the operation of the public school system requires that courts exercise care and restraint, as public education is largely committed to the control of state and local authorities. *Marshall v. Elwell,* 495 F.Supp. 306, 312 (D.N.H. 1980), *citing Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).

### III. *Pendent Jurisdiction.*

■ We accept pendent jurisdiction in accordance with the suggestion in *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), that discretion to do so be exercised where state and federal claims must derive from a common nucleus of operative fact. However, we disagree with the plaintiffs' reading of the statute that the term "said pupils" contained in N.H. RSA 189:9–a refers only to pupils who are actually guilty of violation of the reasonable rules and regulations promulgated by the school board. So read, the subsequent provision contained elsewhere in the statute that an appeal may be had within ten days of suspension of a bus route would be nullified, for only those who had been found guilty could exercise this right of appeal. As we have determined in our previous discussion of procedural and substantive due process that a pre-suspension hearing to determine guilt or innocence is not constitutionally required, it follows that the statute has equal application to innocent and guilty and that it would not fall for constitutional infirmity.

### CONCLUSION

The equitable relief which the plaintiffs herein seek requires the Court to consider the factors of (1) the significance of the threat of irreparable harm to plaintiffs if such relief is not granted; (2) the balance between such harm and the injury that injunctive relief would inflict on defendants; (3) the probability of success on the merits; and (4) the public interest. *Grimard v. Carlston,* 567 F.2d 1171 (1st Cir. 1978); *National Tank Truck Carriers, Inc. v. Burke,* 608 F.2d 819 (1st Cir. 1979).

■ It is clear here that the harm to the plaintiffs is minimal compared to the dan-

**1374**

ger to safe operation of school buses and the property damage entailed if the bus suspension policy were to be enjoined. As we have previously discussed, the balance herein definitely favors the defendants, and as we have determined that plaintiffs should not succeed on the merits because the public interest otherwise requires, we accordingly conclude that plaintiffs herein are entitled neither to injunctive nor to declaratory relief, as both the applicable statute and the bus suspension policy of the Board are not constitutionally infirm. Parenthetically, the Court notes that a hearing before a student council or parent-teacher organization at which all riders of a bus allegedly involved in unsafe or damaging practices might be heard is a possible alternative to the adversarial posture of litigation and its necessary end result of bitterness. However, having found and ruled, Rule 52(a), Federal Rules of Civil Procedure, that no constitutional rights of plaintiffs have been infringed by the actions of the defendants, we consider that no mandate should issue from this court. Judgment is accordingly ordered for the defendants on all counts of the complaint.

SO ORDERED.