Thomas ROSE, et al., Plaintiffs,
Appellants,

v.

The NASHUA BOARD OF EDUCATION
and its Members, et al.,
Defendants, Appellees.

No. 81–1199.

United States Court of Appeals,
First Circuit.

Argued April 9, 1982.

Decided June 3, 1982.

Kris E. Durmer, Nashua, N. H., with whom Kahn, Brown & Bruno, Nashua, N. H., was on brief, for plaintiffs, appellants.

Robert P. Sullivan, Nashua, N. H., for defendants, appellees.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

This case raises the question of the extent to which the Fourteenth Amendment imposes "due process" obligations upon a school board seeking to suspend school bus trips briefly for disciplinary purposes. After examining the facts of this case, we have concluded that the school authorities complied with whatever obligations the Constitution might impose.

I

The law of the State of New Hampshire requires school districts to provide free school bus transportation to most pupils under the age of 14. N.H.Rev.Stat.Ann. §§ 189:6–8. Several years ago, bus drivers began to complain about vandalism and disruptive conduct on certain bus routes in Nashua. Students were apparently throwing things about inside the buses and at passing cars; they were slashing seats; they were excessively noisy and disrespectful to the drivers. Because the drivers had to watch the road, they could not tell which specific students were responsible. The private company supplying the bus service complained to the Nashua Board of Education. After hearings and consideration of alternatives, the Board adopted a suspension policy.

The policy applied to instances of serious disruption, significant vandalism, or danger. In such cases, when other methods of dealing with the disciplinary problem failed, a school official would board the bus and tell the students that the route would be suspended if the guilty students did not come forward. If this did not work, the Board's "transportation director" would write to the parents telling them that the bus route would be suspended unless the troublemakers were identified. As a last resort, the Board could suspend the route for up to five days.

When several parents objected to this policy, the Board held hearings. It considered several alternatives, such as seat assignments, ID cards, even special police ("monitors") to ride the bus. But, believing that these alternatives were either too expensive, or not always effective, it retained its rule allowing temporary (five day) suspensions after advance notice to affected students and parents.

According to the Board, the policy has been successful. During the first year of the policy's operation there were only 12 suspensions. Since there are 150 school bus routes and each bus makes two trips per day for 180 school days, the total number of bus trips lost could not have amounted to more than 120 out of 54,000. And, judging from the fact that the Board wishes to keep the policy, it believes that the threat of suspension has a salutary effect on discipline. Its belief is supported by the fact that only 3 or 4 routes were suspended in the policy's second year of operation.

The objecting parents, however, claim that their children are not the ones who cause the trouble. They attack the policy as unfair, for it makes their children suffer for the sins of others, and they claim it violates both state and federal law. The district court, 506 F.Supp. 1366, rejected their legal claims, as do we.

II

We first take up the parents' pendent state law claim. They argue that New Hampshire state law imposes a specific

duty upon the school district to provide bus transportation for their children. N.H.Rev. Stat.Ann. §§ 189:6–8. This law, they claim, gives them a right to that transportation. They are aware that the statute specifically authorizes the school superintendent "to suspend the right of pupils from riding in a school bus when said pupils fail to conform to the reasonable rules and regulations" of the Board. *Id.* § 189:9–a. But, they argue, this statute allows suspension only of the troublemakers, not those who ride the buses with them. The district court rejected this argument, holding that the statute allows the superintendent to suspend the rights of *all* the students who ride the bus.

We uphold the district court's interpretation of the statute. For one thing, we are reluctant to interfere with a reasonable construction of state law made by a district judge, sitting in the state, who is familiar with that state's law and practices. *Berrios Rivera v. British Ropes, Ltd.*, 575 F.2d 966, 970 (1st Cir. 1978). *See Clairol, Inc. v. Boston Discount Center of Berkley, Inc.*, 608 F.2d 1114, 1120 n.8 (6th Cir. 1979); *Black v. Fidelity & Guaranty Ins. Underwriters, Inc.*, 582 F.2d 984, 987 (5th Cir. 1978); *Reno v. Beckett*, 555 F.2d 757, 765 (10th Cir. 1977); *Cameron v. Law*, 538 F.2d 763, 765 (7th Cir. 1976). *Cf. Bishop v. Wood*, 426 U.S. 341, 346–47 & n.10, 96 S.Ct. 2074, 2078 & n.10, 48 L.Ed.2d 684 (1976). For another thing, the court's interpretation of the statute *is* reasonable. The statute specifically provides that the parents of a suspended pupil can appeal a suspension, but *in the meantime* the parents must provide transportation. N.H.Rev.Stat.Ann. § 189:9–a. Thus, the statute plainly allows suspension of those who are only *suspected* of violating the rules. In this instance, the potential rule violators include both those who slash seats, and those who don't turn the seat-slashers over to the authorities. And, since the driver does not know who on the bus has violated the rules, all are presumably suspect—or at least, so many are suspect that it is reasonable to treat the statute's reference to "pupils who fail to conform to the reasonable rules and regula-

tions" as applying to all of them. We therefore affirm the judge's decision that, as a matter of state law, the School Board's policy is authorized.

### III

Appellants' main argument is that New Hampshire law, as so interpreted, is unconstitutional. They claim that the Fourteenth Amendment, in forbidding deprivation of "property . . . without due process of law," requires a prior hearing to determine likely guilt or innocence before the Board can deprive a pupil of bus transportation—even for five days. We do not agree.

■ As an initial matter, we have serious doubts about whether the pupils or their parents have asserted a property interest sufficiently weighty for the Due Process Clause to apply. No one here complains about any deprivation of education, or educational opportunity. *Compare Goss v. Lopez*, 419 U.S. 565, 576, 95 S.Ct. 729, 737, 42 L.Ed.2d 725 (1975); *cf. Jordan v. School District of Erie*, 583 F.2d 91 (3d Cir. 1978). The Board asserted at oral argument, without contradiction, that as soon as it identified a pupil who could not get to school on his own (because he was handicapped) it immediately arranged for alternate transportation. Nor is anyone complaining of permanent loss of transportation. The maximum harm is the inconvenience for parents or children of a car pool, a long walk, or some other private transportation arrangement for five days in the school year. This is hardly a "grievous loss," *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), or the deprivation of a particularly important right, privilege or opportunity. No one claims a reputational injury. *Compare Goss v. Lopez*, 419 U.S. at 576, 95 S.Ct. at 737. And, there is no great principle at stake (as, for example, in cases dealing with voting rights, *see, e.g., Harper v. Virginia Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1963); *Baker v. Carr*, 369 U.S. 420, 82 S.Ct. 186, 7 L.Ed.2d 663 (1961),

environmental issues, *see, e.g., United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), or public assistance, *see, e.g., Gray Panthers v. Schweiker*, 652 F.2d 146, 156 n.19 (D.C.Cir.1980), that might make the harm more important than, at first glance, it appears.

The fact that New Hampshire law guarantees free bus transportation does not seem sufficient to create a constitutionally protected interest in the *suspension-free* service that appellants seek. In deciding whether an interest in a government benefit rises to the level of protected property, the Supreme Court has us look to the reasonable expectations of those who receive the benefit. "It is a purpose of the ancient institution of property," the Court has written, "to protect those claims upon which people rely in their daily lives." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Beitzell v. Jeffrey*, 643 F.2d 870, 874 (1st Cir. 1981). While the New Hampshire statute could have created a reasonable expectation of bus service here, it could not have led the appellants to expect service *free of short suspensions.* The vagaries of weather, equipment failures, labor disputes, safety problems, and other similar occurrences, make it reasonable for riders to expect occasional interruptions in service for reasons of the sort at issue here. There thus could be no reasonable expectation, derived from the statute, of continuous service without suspensions. And since, as previously pointed out, the deprivation itself caused only inconvenience, not loss of educational opportunity or other significant injury, we believe it is a "de minimis" deprivation that does not call for constitutional "Due Process" protection. *Goss v. Lopez*, 419 U.S. at 576, 95 S.Ct. at 737.

■ Even if there were constitutionally protected "property" at stake, however, the appellants received the "process" they are "due." In determining whether "due process" requires a particular procedural safeguard (say, a hearing prior to deprivation), we are to take at least three factors into account: 1) the value or importance of the property interest at stake; 2) the probability of an erroneous deprivation if the safeguard is not provided; and 3) the cost of, or the burden imposed by, the safeguard. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *Frost v. Weinberger*, 515 F.2d 57, 66 (2d Cir. 1975); *Sutton v. City of Milwaukee*, 672 F.2d 644 (7th Cir. 1982). *See* Mashaw, *The Supreme Court's Due Process Calculus for Administrative Adjudication in Mathews v. Eldridge: Three Factors in Search of a Theory of Value*, 44 U.Chi.L.Rev. 28, 46–48 (1976).

In this case, as already pointed out, the importance of the property interest is small. The likelihood of an erroneous deprivation without a prior hearing, however, is significant. The Board's policy deprives students of bus transportation who took no part in any trouble-making activities. A prior hearing might prevent this, but at substantial cost—namely, the cost of abandoning the suspension program altogether. The program was instituted because the Board could not identify the troublemakers in advance. To require an individual hearing is to require identification before suspension—the very thing the Board is unable to do.

■ The issue then comes down to the reasonableness of the suspension program itself. Appellants, citing *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960), claim that the program is inherently unreasonable, for it punishes the "innocent" along with the "guilty." We are not dealing here, however, with criminal punishments or with sending someone to prison without evidence. *Compare id.* At issue is discipline on school buses, quite another matter, and one where the lessons drawn from criminal trials may not be totally appropriate. On the one hand, the notion of penalizing a whole class (by, say, keeping them after school or cancelling "recess") because of trouble caused by a few is (or at least used to be) fairly common in the world of school discipline. The serious risks and dangers associated with throwing objects in and outside of moving buses, on the other hand, are obvious, and warrant seri-

ous measures aimed at avoiding them. Moreover, the Board here has held full hearings on its policy, it has considered alternatives, and it has decided that its policy offers the most promising avenue to avoid vandalism, disruption, and driving hazards on school buses. We cannot find that judgment unreasonable, particularly when the Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and ... school officials, consistent with fundamental constitutional safeguards, to prescribe control of conduct in the schools." *Tinker v. Des Moines School District*, 393 U.S. 503, 507, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). *See also Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).

From a constitutional perspective, then, we find no interests here at stake either sufficiently great in amount or fundamental in nature to require greater procedural protection than the Board has offered—particularly when increased protection would merely prevent the implementation of a reasonable disciplinary policy aimed at securing the safety of the children riding school buses.

For these reasons, the decision of the district court is

*Affirmed.*