Monya G. VIRGIL, James Virgil, Claudia H. Johnson, and Susan G. Davis, Plaintiffs,

v.

SCHOOL BOARD OF COLUMBIA COUNTY, FLORIDA, and Silas Pittman as Superintendent of the Columbia County School System, Defendants.

No. 86–1030–Civ–J–14.

United States District Court, M.D. Florida, Jacksonville Division.

Jan. 29, 1988.

Samuel S. Jacobson, American Civil Liberties Union of Florida, Jacksonville, Fla., for plaintiffs.

Daniel C. Shaughnessy, Coker, Myers & Schickel, P.A., Jacksonville, Fla., for defendants.

## OPINION AND ORDER

SUSAN H. BLACK, District Judge.

This cause came on to be heard upon the parties' cross-motions for summary judgment, filed by the defendants and the plaintiffs, respectively, on June 22 and July 27, 1987. The defendants filed a response to the plaintiffs' Motion for Summary Judgment on August 24, 1987, and hearings were held on September 10 and December 16, 1987.

### I. *Undisputed Facts*

Pursuant to the written stipulations filed by the parties on July 15 and October 14, 1987, as well as the oral stipulations made by the parties at oral argument, the Court makes the following findings of fact.

From approximately 1975 to the present, Columbia High School has offered a two-semester course entitled "Humanities to 1500" to its students. In 1985, the school designed the course for eleventh- or twelfth-grade students, and prescribed as textbooks Volumes I and II of *The Humanities: Cultural Roots and Continuities* (M. Witt, *et al.* ed. 1980) [hereinafter *"Humanities"*]. In the previous year, the Florida Department of Education had approved these textbooks for humanities courses and placed them on its Catalog of State–Adopted Instructional Materials for secondary school students.

Among the selections in Volume I of *Humanities* are English translations of the play *Lysistrata*, written by the Athenian playwright Aristophanes in approximately 411 B.C., and the narrative poem *The Miller's Tale*, written by the English poet Geoffrey Chaucer in approximately 1380 A.D. Although neither *Lysistrata* nor *The Miller's Tale* were required or assigned reading in the humanities course, a portion of *Lysistrata* was read aloud in class during a session of the humanities course in the first semester of the 1985–86 school year. Among the students in the class on that day was the daughter of The Reverend and Mrs. Fritz M. Fountain.

In the spring of 1986, The Reverend and Mrs. Fountain filed a formal complaint regarding Volume I of *Humanities* with the defendant School Board of Columbia County, the government entity responsible for

administration of the Columbia County School System [hereinafter "School Board"]. The Fountains also filed a Request for Examination of School Media on a form provided by the defendants.

In response to this complaint, the School Board first adopted a "Policy on Challenged State Adopted Textbooks," which established the mechanisms for addressing any challenges to textbooks in use in the school system. Next, pursuant to the newly-enacted policy, the School Board appointed an advisory committee to review Volume I of *Humanities*. The advisory committee reviewed Volume I and recommended that the textbook be retained in the curriculum, but that *Lysistrata* and *The Miller's Tale* not be required reading in the humanities course.

At its April 22, 1986, meeting, the School Board considered the advisory committee's report on Volume I. It also heard from the defendant Silas Pittman, the Superintendent of the Columbia County School System. Pittman disagreed with the committee's findings and recommended either that *Lysistrata* and *The Miller's Tale* be deleted from Volume I or that the book itself be discontinued from use in the school's curriculum. The School Board agreed with the latter proposal, voting to discontinue any future use of Volume I in the curriculum. On a subsequent date, the Board members provided the following reasons for their decision:

1. The sexuality in the two selections.

2. A belief that portions of the two selections were excessively vulgar in language and subject matter, regardless of the value of the works as literary classics.

3. A belief that the subject matter of the selections was immoral, insofar as the selections involved graphic, humorous treatment of sexual intercourse and dealt with sexual intercourse out of wedlock.

4. A belief that the sexuality of the selections was violative of the social-ly and philosophically conservative mores, principles and values of most of the Columbia County populace.

5. A belief that the subject matter and language of the selections would be offensive to a substantial portion of the Columbia County populace.

6. A belief that the two selections were not necessary for adequate instruction in the course; nor was this particular textbook, in its entirety, necessary for instruction in the course.

7. A belief that the two selections were inappropriate to the age, maturity, and development of the students in question.

Stipulation Concerning Board Reasons, filed on October 14, 1987.

Pursuant to the School Board's April 22, 1986, decision, Volume I of *Humanities* was placed in a storeroom and has been kept there ever since. Thereafter, Volume II of *Humanities* has been used as the textbook for both semesters of the humanities course. In addition, both Volumes I and II have been placed in the school library and made available for student use. Other adaptations and translations of *Lysistrata* and *The Miller's Tale* are also maintained in the school library.

In their Motion for Summary Judgment, the defendants contend that the School Board's decision to remove Volume I of *Humanities* falls within the scope of its broad discretion regarding establishment of high school curriculum. According to the defendants, the School Board simply performed its proper function of transmitting community values by removing materials that it considered to be vulgar or indecent.

The plaintiffs argue in their Motion for Summary Judgment that despite the School Board's broad discretion regarding curriculum, the Board must nonetheless exercise that discretion in a manner that comports with the first amendment. According to the plaintiffs, removal of the textbook in the present case violated the first amend-

ment because the School Board improperly attempted to deny the students access to views which differ from its fundamentalist religious orthodoxy.[1]

## II. *Conclusions of Law*

This case presents an important question regarding the first amendment rights of high school students: may a school board remove from its curriculum materials of undisputed literary value based on its determination that the sexuality and vulgarity within those materials is unsuitable for the students? Based on the Supreme Court's recent decision in *Hazelwood School District v. Kuhlmeier*, — U.S. —, 108 S.Ct. 562, 98 L.Ed.2d 592 (U.S. 1988), the Court finds that the defendants acted within their broad range of discretion in determining the educational suitability of the curricular materials in question.

Before addressing the facts of this case, the Court must resolve the dispute between the parties with respect to the appropriate standard of review. As noted by the defendants, the Supreme Court has long held that the courts "do not intervene in the resolution of conflicts which arise in the daily operation of school systems" unless "basic constitutional values" are "directly and sharply implicate[d]" in those conflicts. *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). Inculcation of the values necessary to the maintenance of a democratic system is clearly the work of the schools. *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549, 558 (1986) (quotations omitted).

On the other hand, it is a fundamental principle that "students do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Thus, for example, the Su-

preme Court has held that a school board may not compel a student to participate in a flag salute ceremony, *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), or prohibit a student from expressing political views, so long as that expression does not disrupt the educational process. *Tinker, supra.*

The plaintiffs argue that because the disputed materials in this case were removed from an elective course and because they were considered optional reading within that course, this Court must apply the Supreme Court's decision in *Board of Education v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (plurality opinion).[2] In *Pico*, a plurality of the Supreme Court held that a school board violated students' first amendment rights to receive information and ideas by removing certain books from the high school library. In light of the "regime of voluntary inquiry that ... holds sway" in a school library, the Court found that the school board could not rely on its duty to inculcate community values in justifying its removal decision. *Id.* at 869, 102 S.Ct. at 2809 (plurality opinion). The Court reversed the entry of summary judgment in favor of the defendants because questions of fact remained regarding "the possibility that [the defendants'] decision to remove the books rested decisively upon disagreement with constitutionally protected ideas in those books, or upon a desire on [the defendants'] part to impose upon the students ... a political orthodoxy to which [the defendants] and their constituents adhered." *Id.* at 875, 102 S.Ct. at 2812 (plurality opinion); *see also id.* at 879–80, 102 S.Ct. at 2814–15 (Blackmun, J., concurring) ("[S]chool officials may not remove books for the *purpose* of restricting access to the political ideas and social perspectives discussed in them, when that action is motivated simply by the officials'

---

1. The plaintiffs do not contend that the defendants violated the "establishment of religion" clause of the first amendment, and the Court, therefore, does not consider the issue.

2. The Court notes that the parties' arguments were framed prior to the entry of the Supreme Court decision in *Hazelwood School District v. Kuhlmeier*, — U.S. —, 108 S.Ct. 562, 98 L.Ed. 2d 592 (U.S.1988).

disapproval of the ideas involved.") (Emphasis in original.)[3]

In light of the recent decision of the United States Supreme Court in *Hazelwood School District v. Kuhlmeier*, — U.S. —, 108 S.Ct. 562, 98 L.Ed.2d 592 (U.S. 1988), this Court need not decide whether the plurality decision in *Pico* may logically be extended to optional curriculum materials. *Kuhlmeier* resolves any doubts as to the appropriate standard to be applied whenever a curriculum decision is subject to first amendment review.[4] In a case involving the removal by school authorities of materials from a high school journalism class's newspaper, the Court in *Kuhlmeier* held:

> [E]ducators do not offend the first amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.... It is only when the decision to censor a school-sponsored publication, theatrical production or other vehicle of student expression has no valid educational purpose that the First Amendment is so "directly and sharply implicated" as to require judicial intervention to protect students' constitutional rights.

*Id.* — U.S. at —, 108 S.Ct. at 571 (citations omitted).[5]

In establishing this deferential standard, the Court distinguished educators' decisions regarding student expression in the curriculum from decisions affecting student expression "that happens to occur on the school premises." *Id.* — U.S. at —, 108 S.Ct. at 569. According to the Court, educators must have greater control over curriculum-related expression to achieve certain pedagogical goals: "to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Id.*

Applying the newly-established standard to the facts before it, the Court in *Kuhlmeier* found that the defendants had demonstrated the requisite "reasonable relationship" between their decision to remove materials regarding teenage pregnancy and divorce from the journalism class's

---

**3.** Numerous lower federal courts have similarly determined that the removal of books from a school library violated the first amendment rights of students by denying access to information and ideas. *See, e.g., Minarcini v. Strongsville City School District*, 541 F.2d 577 (6th Cir. 1976); *Sheck v. Baileyville School Committee*, 530 F.Supp. 679 (D.Maine 1982); *Salvail v. Nashua Board of Education*, 469 F.Supp. 1269 (D.N.H.1979); *Right to Read Defense Committee of Chelsea v. School Committee of the City of Chelsea*, 454 F.Supp. 703 (D.Mass.1978). At least two federal courts of appeal have gone further and held that a school board's *curriculum* decision implicated the students' first amendment rights. *Pratt v. Independent School District No. 831*, 670 F.2d 771, 778 (8th Cir.1982) (overturning school board decision to ban films which was based on offensiveness of films' ideological and religious themes); *Zykan v. Warsaw Community School Corp.*, 631 F.2d 1300, 1306 (7th Cir.1980) (upholding school board decision to remove books from curriculum because decision was not intended to impose religious or scientific orthodoxy or to eliminate a particular kind of inquiry generally).

**4.** Although it did not specifically refer to textbooks, the Court evidently sought to address a wide realm of "curriculum" decisions, including those affecting textbooks. According to the Court, the first amendment question raised by the facts before it concerned "educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Kuhlmeier*, — U.S. at —, 108 S.Ct. at 569-70.

**5.** In a separate part of its opinion, the Court held that because school officials did not clearly intend to convert the journalism class's newspaper into a public forum, they were entitled to regulate the contents of the newspaper in any reasonable manner. *Kuhlmeier*, — U.S. at —, 108 S.Ct. at 567-71.

newspaper and the above-listed pedagogical goals. *Id.* —— U.S. at ——, 108 S.Ct. at 571. With regard to the pedagogical goal of selecting materials appropriate to the students' level of maturity, the Court noted that although the materials did not contain graphic accounts of sexual activity, the girls in the article commented on their sexual histories and their use or nonuse of birth control. Based on these comments, the Court found that "[i]t was not unreasonable for the principal to have concluded that such frank talk was inappropriate in a school-sponsored publication distributed to 14–year–old freshmen and presumably taken home to be read by students' even younger brothers and sisters." *Id.*

■■■ Given the breadth of the *Kuhlmeier* decision, *see supra* note 4, this Court must apply the *Kuhlmeier* standard to the present case. Initially, the Court must determine whether the pedagogical goals motivating the School Board's decision in this case were legitimate ones. The members of the School Board identified two specific factors as having given rise to their decision to remove Volume I of *Humanities:* "the sexuality in the two selections" and the selections' "excessively vulgar ... language and subject matter." The remainder of the reasons supplied by the Board members simply amplify why they believed that vulgar and sexually explicit materials could properly be removed from the curriculum. According to the Board members, the content of the subject materials violated the "conservative mores" of the community and was "inappropriate to the age, maturity and development of the students."

The plaintiffs contend that these reasons highlight the actual purpose of the Board members in removing the subject materials from the humanities curriculum, which was to impose their fundamentalist Christian beliefs on the students. According to the plaintiffs, such an attempt to deny the stu-dents access to viewpoints differing from the Board members' religious orthodoxy is essentially what the first amendment forbids.

The Court agrees with the plaintiffs that the School Board's decision reflects its own restrictive views of the appropriate values to which Columbia High School students should be exposed. The Court finds, however, that such content-based decision-making regarding curriculum is permissible under the standards set forth in *Kuhlmeier.* The Court in *Kuhlmeier* held that educators may limit both the "style and content" of curricular materials if their action is reasonably related to legitimate pedagogical concerns. —— U.S. at ——, 108 S.Ct. at 569–71.[6] The Court further held that denying students access to "potentially sensitive topics" such as sexuality is a legitimate pedagogical end. *Id. But see West Virginia Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943) (schools may not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion"). Because this pedagogical goal is the uncontroverted justification for the School Board's decision in the present case, this Court need only consider whether the decision of the School Board was reasonably related to this goal.

The Court faces a number of difficulties in making this determination. First, the Court finds it difficult to apprehend the harm which could conceivably be caused to a group of eleventh- and twelfth-grade students by exposure to Aristophanes and Chaucer. Indeed, authorities on Western literature are virtually unanimous in their high praise for the works of these authors. *See, e.g.,* U. Violia, *Greek and Roman Classics,* (1965), at 328 (Aristophanes's comedies "are considered among the greatest ever written"); *Major British Writers,* (G.B. Harrison, ed. 1967), at 1 (Chaucer's name "stands in the annals of English literature second only to that of Shakespeare").

6. This aspect of the Court's holding places into question the continued validity of the analysis of "viewpoint-neutrality" which was employed by the courts of appeal in *Pratt v. Independent* *School District No. 831,* 670 F.2d 771, 778 (8th Cir.1982) and *Zykan v. Warsaw Community School Corp.,* 631 F.2d 1300, 1306 (7th Cir.1980). *See supra* note 3.

Second, the Court has a more general concern regarding the breadth of measures that may be taken to protect students from materials containing sexuality or vulgarity. The plaintiffs argue in this case that the School Board's decision to remove Volume I in its entirety, rather than to take the less drastic measure of warning students of the potentially sensitive nature of two particular works, violates the established first amendment principle that restrictions on speech must be "narrowly tailored" to achieve the government's legitimate interests. Under the standard set forth in *Kuhlmeier*, however, a School Board's decision to remove curricular materials will be upheld if it is reasonable, even where that decision is not the least restrictive of student speech. *See Kuhlmeier*, —— U.S. at ——, 108 S.Ct. at 571–73 (upholding principal's decision to excise two pages of newspaper rather than objectionable articles within those two pages). *See generally Cornelius v. NAACP Legal Defense and Education Fund, Inc.*, 473 U.S. 788, 808, 105 S.Ct. 3439, 3452–53, 87 L.Ed.2d

567 (1985) (government's limitation of speech in nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation). Thus, under *Kuhlmeier*, this Court assumes the limited role of determining whether sexuality or vulgarity are at all present in the removed materials, and if so, determining whether the measure taken to remove the sexuality and vulgarity was at all reasonable.

The Court finds that sexuality and vulgarity are both unquestionably present in the contested materials. The plots of both *Lysistrata* and *The Miller's Tale* involve sexual relations: *Lysistrata* concerns the attempt by the women of a community to put an end to an ongoing war by denying the men sexual intercourse; *The Miller's Tale* concerns a sexual affair between a divinity student and his landlord's wife. In addition, both works contain passages which may reasonably be considered to be sexually explicit[7] or vulgar.[8]

The Court finds that the School Board's removal of Volume I of *Humanities* was

---

**7.** An example of a sexually explicit passage may be found in *Lysistrata*, where the heroine Lysistrata leads the women of the community in a pledge of allegiance designed to convince the men of the community to end the Peloponnesian Wars.

LYSISTRATA Lampito: all of you women: come, touch the bowl, and repeat after me:
I WILL HAVE NOTHING TO DO WITH MY HUSBAND OR MY LOVER
KALONIKE I will have nothing to do with my husband or my lover
LYSISTRATA THOUGH HE COME TO ME IN PITIABLE CONDITION
KALONIKE Though he come to me in pitiable condition
(Oh, Lysistrata! This is killing me!)
LYSISTRATA I WILL STAY IN MY HOUSE UNTOUCHABLE
KALONIKE I will stay in my house untouchable
LYSISTRATA IN MY THINNEST SAFFRON SILK
KALONIKE In my thinnest saffron silk
LYSISTRATA AND MAKE HIM LONG FOR ME.
KALONIKE And make him long for me.
LYSISTRATA I WILL NOT GIVE MYSELF
KALONIKE I will not give myself
LYSISTRATA AND IF HE CONSTRAINS ME
KALONIKE And if he constrains me
LYSISTRATA I WILL BE AS COLD AS ICE AND NEVER MOVE
KALONIKE I will be as cold as ice and never move

LYSISTRATA I WILL NOT LIFT MY SLIPPERS TOWARD THE CEILING
KALONIKE I will not lift my slippers toward the ceiling
LYSISTRATA OR CROUCH ON ALL FOURS LIKE THE LIONESS IN THE CARVING
KALONIKE Or crouch on all fours like the lioness in the carving
LYSISTRATA AND IF I KEEP THIS OATH LET ME DRINK FROM THIS BOWL
KALONIKE And if I keep this oath let me drink from this bowl
LYSISTRATA IF NOT, LET MY OWN BOWL BE FILLED WITH WATER.
KALONIKE If not, let my own bowl be filled with water.
LYSISTRATA You have all sworn?
MYRRHINE We have.
Volume I, *Humanities*, at 72–73.

**8.** An example of what may be reasonably considered to be vulgarity may be found in *The Miller's Tale*, where the parish clerk Absalon attempts to kiss the landlord's wife Alison at her bedroom window:

The night was dark as pitch, black as coal, and out the window she thrust her hole. And Absolon, as Fortune had in store for him, with his mouth kissed her naked ass with relish before he knew what was happening. He started back and thought something was wrong, for he knew well that women do not have beards and he had felt something rough and long-haired.

reasonably related to its pedagogical goal of keeping vulgarity and certain matters of sexuality out of its curriculum. Although the School Board could reasonably have, as the plaintiffs suggest, provided warnings to students regarding the potentially objectionable contents of *Lysistrata* and *The Miller's Tale*, the School Board's chosen alternative was not an unreasonable one. Given the stated beliefs of the School Board regarding sexuality and vulgarity, the Board reasonably decided that including Volume I in its curriculum would be inconsistent with its duty to limit students' exposure to "material that may be inappropriate for their level of maturity." *Kuhlmeier*, —— U.S. at ——, 108 S.Ct. at 570. Given these beliefs, the additional step of making Volume I available in the school library represented a fair compromise with those students holding a particular interest in Volume I.

### III. *Conclusion*

The parties do not dispute that the curriculum decision of the School Board in this case was based on the Board's own standards regarding sexuality and vulgarity. Although the Court wishes that the Board had imposed its standards in a manner less restrictive of speech, the Court recognizes that the Board retains broad discretion under our constitutional system in dealing with such potentially sensitive topics. As stated by the Supreme Court in *Hazelwood School District v. Kuhlmeier*, —— U.S. ——, 108 S.Ct. 562, 98 L.Ed.2d 592 (U.S. 1988), "the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Id.* —— U.S. at ——, 108 S.Ct. at 571. The Court will therefore grant the defendants' Motion for Summary Judgment.

Volume I, *Humanities*, at 212. In another passage, Alison's lover, Nicholas, similarly encounters Absalon:

Nicholas had gotten up to piss and thought that he could improve on the joke. He would have Absalon kiss his ass before he left. He quickly raised the window up and slyly thrust his ass far out, buttocks and all, even to the haunches.

Accordingly, it is

ORDERED:

1. That the defendants' Motion for Summary Judgment, filed on June 22, 1987, is granted.

2. That the Clerk of the Court shall enter final judgment in favor of the defendants and against the plaintiffs.

3. That the plaintiffs' Motion for Summary Judgment, filed on July 27, 1987, is denied.

Then Absalon said, "Speak, sweet bird. I don't know where you are."

Nicholas at once let fly a fart as great as a thunder clap, that almost blinded Absalon. But he was ready with his hot iron and smote Nicholas in the middle of his ass.

*Id.* at 213.