862 F.2d 1517
 57 USLW 2430, 50 Ed. Law Rep. 718
 Monya G. VIRGIL, James Virgil, Claudia H. Johnson, Susan G.
Davis, Plaintiffs- Appellants,
v.
SCHOOL BOARD OF COLUMBIA COUNTY, FLORIDA, Silas Pittman as
Superintendent of the Columbia County School
System, Defendants-Appellees.
 No. 88-3127.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 12, 1989.
 
 Samuel Jacobson, American Civil Liberties Union of Fla., Jacksonville, Fla., for plaintiffs-appellants.
 Daniel C. Shaughnessy, John Schickel, Coker, Myers & Schickel, P.A., Jacksonville, Fla., for defendants-appellees.
 Joseph Onek, Onek, Klein & Farr, Washington, D.C., amicus curiae, for People for the American Way.
 Appeal from the United States District Court for the Middle District of Florida.
 Before TJOFLAT, ANDERSON and COX, Circuit Judges.
 ANDERSON, Circuit Judge:
 
 
 1
 This case presents the question of whether the first amendment prevents a school board from removing a previously approved textbook from an elective high school class because of objections to the material's vulgarity and sexual explicitness. We conclude that a school board may, without contravening constitutional limits, take such action where, as here, its methods are "reasonably related to legitimate pedagogical concerns." Accordingly, we affirm the judgment of the district court.
 
 I. FACTS
 
 2
 The essential facts were stipulated by the parties to this dispute. Since about 1975 the educational curriculum at Columbia High School has included a course entitled "Humanities to 1500" offered as part of a two-semester survey of Western thought, art and literature. In 1985 the school designed the course for eleventh- and twelfth-grade students[1] and prescribed as a textbook Volume I of The Humanities: Cultural Roots and Continuities.[2] This book contained both required and optional readings for the course.
 
 
 3
 Among the selections included in Volume I of Humanities which were neither required nor assigned are English translations of Lysistrata, written by the Greek dramatist Aristophanes in approximately 411 B.C., and The Miller's Tale, written by the English poet Geoffrey Chaucer around 1380-1390 A.D. During the fall semester of the 1985-86 school year, a portion of Lysistrata was read aloud in class during a session of the Humanities course.
 
 
 4
 In the spring of 1986, after the first semester had ended, the Reverend and Mrs. Fritz M. Fountain, the parents of a student who had taken the class in the fall of 1985, filed a formal complaint concerning Volume I of Humanities with the School Board of Columbia County. The Fountains also submitted a Request for Examination of School Media. Their objections centered upon Lysistrata and The Miller's Tale.
 
 
 5
 In response to this parental complaint, the School Board on April 8, 1986 adopted a Policy on Challenged State Adopted Textbooks to address any complaints regarding books in use in the curriculum. Pursuant to the new policy, the School Board appointed an advisory committee to review Volume I of Humanities. Upon examination, the committee recommended that the textbook be retained in the curriculum, but that Lysistrata and The Miller's Tale not be assigned as required reading.
 
 
 6
 At its April 22, 1986 meeting the School Board considered the advisory committee's report. Silas Pittman, Superintendent of the Columbia County School System, offered his disagreement with the committee's conclusion, and recommended that the two disputed selections be deleted from Volume I or that use of the book in the curriculum be terminated. Adopting the latter proposal, the School Board voted to discontinue any future use of Volume I in the curriculum.
 
 
 7
 Pursuant to the Board decision, Volume I of Humanities was placed in locked storage and has been kept there ever since. Volume II was used as the course textbook for the rest of the second semester of the 1985-86 academic year, as well as for both semesters of the "Humanities" course during the 1986-87 term. Since the Board's removal decision, both Volumes I and II have been available in the school library for student use, along with other adaptations and translations of Lysistrata and The Miller's Tale.
 
 
 8
 On November 24, 1986 parents of students at Columbia High School filed an action against the School Board and the Superintendent seeking an injunction against the textbook removal and a declaration that such action violated their first amendment rights. Cross-motions for summary judgment were filed by defendants-appellees, on June 22, 1987, and by plaintiffs-appellants, on July 27, 1987. On August 24, 1987 the defendants-appellees filed a response to plaintiffs-appellants' motion. Hearings were held in the district court on September 10 and December 16, 1987. On January 29, 1988 the district court denied the plaintiffs-appellants' motion and granted the defendants-appellees' motion for summary judgment.
 
 
 9
 The district court found that the two principal factors giving rise to the School Board's decision were "the sexuality in the two selections" and their "excessively vulgar ... language and subject matter." 677 F.Supp. at 1552. In the court's view, the other reasons stipulated by the Board members "simply amplify why they believed that vulgar and sexually explicit materials could properly be removed from the curriculum." Id. The court acknowledged that "the School Board's decision reflects its own restrictive views of the appropriate values to which Columbia High School students should be exposed," id., and expressed the difficulty it had in "apprehend[ing] the harm which could conceivably be caused to a group of eleventh- and twelfth-grade students by exposure to Aristophanes and Chaucer." Id. Nonetheless, the court held that the deferential standard recently established in Hazelwood School District v. Kuhlmeier, --- U.S. ----, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), had been met, as the removal decision was "reasonably related" to the "legitimate pedagogical concern" of denying students access to "potentially sensitive topics" such as sexuality. 677 F.Supp. at 1553-54.
 
 
 10
 On February 19, 1988 plaintiffs-appellants filed notice of appeal to this court.
 
 II. DISCUSSION
 
 11
 It has long been clear that public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). At the same time, the Supreme Court has held that the rights of students in public schools are not automatically coextensive with the rights of adults, Hazelwood, --- U.S. at ----, 108 S.Ct. at 567, and has recognized the central role of public schools in transmitting values necessary to the development of an informed citizenry. Bethel School District No. 403 v. Fraser, 478 U.S. 675, 681-84, 106 S.Ct. 3159, 3164-65, 92 L.Ed.2d 549 (1986) (affirming that the essence of public education is "prepar[ing] pupils for citizenship in the Republic" through "inculcation of fundamental values"); Ambach v. Norwick, 441 U.S. 68, 76-77, 99 S.Ct. 1589, 1594, 60 L.Ed.2d 49 (1979) (noting "[t]he importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests"); Board of Education v. Pico, 457 U.S. 853, 876, 102 S.Ct. 2799, 2813, 73 L.Ed.2d 435 (1982) (Blackmun, J., concurring in part and concurring in judgment) ("It therefore seems entirely appropriate that the State use 'public schools [to] ... inculcat[e] fundamental values necessary to the maintenance of a democratic political system' ") (citations omitted).
 
 
 12
 In matters pertaining to the curriculum, educators have been accorded greater control over expression than they may enjoy in other spheres of activity. See Hazelwood School District v. Kuhlmeier, --- U.S. ----, ----, 108 S.Ct. 562, 568-70, 98 L.Ed.2d 592 (1988) (upholding restriction of expression in school-sponsored student newspaper or in other activities which "may fairly be characterized as part of the school curriculum"). See also Board of Education v. Pico, 457 U.S. 853, 869, 102 S.Ct. 2799, 2809, 73 L.Ed.2d 435 (1982) (plurality opinion) (indicating that broad school board discretion in matters of curriculum may be defended by reliance upon school board's duty to inculcate community values); Pratt v. Independent School District, 670 F.2d 771, 775 (8th Cir.1982) (school board's "comprehensive powers and substantial discretion" include "the authority to determine the curriculum that is most suitable for students and the teaching methods that are to be employed, including the educational tools to be used").
 
 
 13
 Still, courts that have addressed the issue have failed to achieve a consensus on the degree of discretion to be accorded school boards to restrict access to curricular materials. Cf. Cary v. Board of Education, 598 F.2d 535 (10th Cir.1979) (rejecting claim that first amendment rights of high school teachers were violated when school board banned from optional instructional use ten non-obscene books out of a list of 1285 previously approved for elective language arts classes for eleventh and twelfth grade students); Zykan v. Warsaw Community School Corporation, 631 F.2d 1300, 1306 (7th Cir.1982) (finding no cognizable constitutional violation in school board's prohibition against use of certain books in course, where it was not alleged that the board sought to "impos[e] some religious or scientific orthodoxy or a desire to eliminate a particular kind of inquiry generally"); Minarcini v. Strongsville City School District, 541 F.2d 577 (6th Cir.1976) (upholding school board action, over objection of faculty committee, refusing to purchase three novels for classroom use and prohibiting their assignment as supplementary reading); with Pratt v. Independent School District, 670 F.2d 771 (8th Cir.1982) (ordering reinstatement to high school curriculum of films which had been removed by school board because of alleged violence and effect on students' religious and family values).[3]
 
 
 14
 The most direct guidance from the Supreme Court is found in the recent case of Hazelwood School District v. Kuhlmeier, --- U.S. ----, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). In Hazelwood the Court upheld the authority of a high school principal to excise two pages from a school-sponsored student newspaper on the grounds that articles concerning teenage pregnancy and divorce were inappropriate for the level of maturity of the intended readers, the privacy interests of the articles' subjects were insufficiently protected, and the controversial views contained therein might erroneously be attributed to the school. Hazelwood established a relatively lenient test for regulation of expression which "may fairly be characterized as part of the school curriculum." Such regulation is permissible so long as it is "reasonably related to legitimate pedagogical concerns." --- U.S. at ----, 108 S.Ct. at 570-71.[4]
 
 
 15
 In applying that test the Supreme Court identified one such legitimate concern which is relevant to this case: "a school must be able to take into account the emotional maturity of the intended audience in determining whether to disseminate student speech on potentially sensitive topics ... [e.g.] the particulars of teenage sexual activity." Id. at 570. See also Bethel School District v. Fraser, 478 U.S. 675, 683, 106 S.Ct. 3159, 3165, 92 L.Ed.2d 549 (1986) (recognizing interest in protecting minors from exposure to "sexually explicit" speech and "vulgar" or "offensive" spoken language); Pico, 457 U.S. at 871, 102 S.Ct. at 2810 (plurality opinion) (removal of books from library would be permissible if decision were based on determination that books were "pervasively vulgar" or not "educational[ly] suitab[le]"); id. at 880, 102 S.Ct. at 2815 (Blackmun, J., concurring in part and concurring in judgment) (removal permissible if motivated by concern that material "contains offensive language ... or because it is psychologically or intellectually inappropriate for the age group").
 
 
 16
 In applying the Hazelwood standard to the instant case, two considerations are particularly significant. First, we conclude that the Board decisions at issue were curricular decisions. The materials removed were part of the textbook used in a regularly scheduled course of study in the school. Plaintiffs argue that this particular course was an elective course, and not a required course. However, common sense indicates that the overall curriculum offered by a school includes not only the core curriculum (i.e., required courses) but also such additional, elective courses of study that school officials design and offer. Each student is expected to select from the several elective courses which school officials deem appropriate in order to fashion a curriculum tailored to his individual needs.
 
 
 17
 One factor identified in Hazelwood as relevant to the determination of whether an activity could fairly be characterized as part of the curriculum is whether "the public might reasonably perceive [the activity] to bear the imprimatur of the school." --- U.S. at ----, 108 S.Ct. at 569. It is clear that elective courses designed and offered by the school would be so perceived. Moreover, we can take judicial notice that the journalism class which was considered in Hazelwood itself to be part of the curriculum was surely an elective course.
 
 
 18
 Plaintiffs further point out that the materials removed in this case not only were part of an elective course, but were optional, not required readings. For the reasons just mentioned, we conclude that the optional readings removed in this case were part of the school curriculum. Just as elective courses are designed by school officials to supplement required courses, optional readings in a particular class are carefully selected by the teacher as relevant and appropriate to supplement required readings in order to further the educational goals of the course. This is especially true in the instant circumstances, where the optional readings were included within the text itself, and thus had to accompany the student every time the text was taken home. Such materials would obviously carry the imprimatur of school approval.[5]
 
 
 19
 The second consideration that is significant in applying the Hazelwood standard to this case is the fact that the motivation for the Board's removal of the readings has been stipulated[6] to be related to the explicit sexuality and excessively vulgar language in the selections.[7] It is clear from Hazelwood and other cases that this is a legitimate concern. School officials can "take into account the emotional maturity of the intended audience in determining ... [the appropriateness of] potentially sensitive topics" such as sex and vulgarity. Hazelwood, --- U.S. at ----, 108 S.Ct. at 570.[8]
 
 
 20
 Since the stipulated motivation of the School Board relates to legitimate concerns, we need only determine whether the Board action was reasonably related thereto. It is of course true, as plaintiffs so forcefully point out, that Lysistrata and The Miller's Tale are widely acclaimed masterpieces of Western literature. However, after careful consideration, we cannot conclude that the school board's actions were not reasonably related to its legitimate concerns regarding the appropriateness (for this high school audience) of the sexuality and vulgarity in these works. Notwithstanding their status as literary classics, Lysistrata and The Miller's Tale contain passages of exceptional sexual explicitness, as numerous commentators have noted.[9] In assessing the reasonableness of the Board's action, we also take into consideration the fact that most of the high school students involved ranged in age from fifteen to just over eighteen, and a substantial number had not yet reached the age of majority.[10] We also note that the disputed materials have not been banned from the school. The Humanities textbook and other adaptations of Lysistrata and The Miller's Tale are available in the school library. No student or teacher is prohibited from assigning or reading these works or discussing the themes contained therein in class or on school property. Cf. Sheck v. Baileyville School Committee, 530 F.Supp. 679 (D.Maine 1982) (granting preliminary injunction against school banning of book from library for its "objectionable" language, where ban extended to mere possession of work anywhere on school property, including school buses). Under all the circumstances of this case, we cannot conclude that the Board's action was not reasonably related to the stated legitimate concern.
 
 
 21
 We decide today only that the Board's removal of these works from the curriculum did not violate the Constitution. Of course, we do not endorse the Board's decision. Like the district court, we seriously question how young persons just below the age of majority can be harmed by these masterpieces of Western literature. However, having concluded that there is no constitutional violation, our role is not to second guess the wisdom of the Board's action.
 
 The judgment of the district court is
 
 22
 AFFIRMED.
 
 
 
 [1]
 Plaintiffs contend that the age of the students "is an especially important consideration here." Appellants' Initial Brief 27. Yet, their calculations suggesting that "all of the instant seniors necessarily would have been eighteen or would have become eighteen during the first semester of their senior year," id. at 27, n. 6, appear inaccurate. Under the Florida statutes in force during the relevant time period, September 1974 through September 1975, if parents exercised their option to send children to school as soon as permitted, first graders would range, in September, from five years eight months to six years eight months. See Fla.Stat.Ann. Sec. 232.01(1)(d) (West 1977) (effective July 1, 1974) ("Any child who has attained the age of 6 years on or before January 1 of the school year of any school having annual promotions shall be admitted to the first grade at any time during the school year."). Thus, seniors at the start of the school year would range from sixteen years eight months to seventeen years eight months. Juniors at the start of the year would range from fifteen years eight months to sixteen years eight months. The literature at issue was to be used in the first semester of the school year. During that time most of the students would range in age from fifteen years, eight months to just under eighteen. The student who reached his eighteenth birthday during the first semester of his senior year would seem to be the exception, not the rule
 If parents waited to send their children to school until they were legally required to do so, first graders would range, in September, from six years seven months to seven years seven months. See Fla.Stat.Ann. Sec. 232.01(1)(a) (West 1977) ("All children who have attained the age of seven years or who will have attained the age of seven years by February 1 of any school year or who are older than seven years of age but who have not attained the age of sixteen years ... are required to attend school regularly during the entire school term"). Thus, seniors at the start of the school year would range from seventeen years seven months to eighteen years seven months. Juniors at the start of the school year would range from sixteen years seven months to seventeen years seven months. Under the assumption that no student attended first grade until legally obligated to do so, some seniors and no juniors would achieve the age of eighteen during the first semester of the school year.
 
 
 [2]
 M. Witt, et al., eds. (1980) (hereinafter Humanities). Virgil v. School Board of Columbia County, 677 F.Supp. 1547, 1548 (M.D.Fla.1988). Volume II of Humanities was used in the second semester course, "Humanities Since 1500." At all times relevant to this litigation Humanities has been the only approved humanities textbook in the Florida Department of Education's Catalog of State-Adopted instructional materials. Stipulation as to Facts 2
 
 
 [3]
 Another line of decisions has placed rather strict limits on school board discretion to use the curriculum to advance religious views in violation of the Establishment Clause. See, e.g., Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (holding facially invalid Louisiana statute forbidding the teaching of the theory of evolution in public elementary and secondary schools without instruction in the theory of "creation science"); Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (striking down state statutes forbidding the teaching in public schools and universities of the theory of evolution). Cf. Mozert v. Hawkins County Board of Education, 827 F.2d 1058 (6th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988) (use in elementary schools of prescribed reading textbooks containing themes in conflict with plaintiffs' religious beliefs did not violate free exercise rights of objecting parents and students); Smith v. Board of School Commissioners of Mobile County, 827 F.2d 684, 693-94 (11th Cir.1987) (use in public schools of history and social studies textbooks did not violate establishment clause, where challenged texts failed to contain references to the religious aspects of certain historic events)
 Despite an oblique reference to "fundamentalist religious doctrine" as a motivation for the removal, see Brief of Amici Curiae Supporting Reversal 24, n. 23, the motivations of the Board were stipulated and do not include any reference to religion. See notes 6 and 7, infra.
 
 
 [4]
 Tinker v. Des Moines Independent School District, 393 U.S. 503, 509, 89 S.Ct. 733, 738, 21 L.Ed.2d 731 (1969), held that school authorities may not prohibit student expressive activity unless it is shown "that engaging in the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." In Hazelwood, the Court expressly declined to employ the more stringent Tinker standard. --- U.S. at ----, 108 S.Ct. at 570
 
 
 [5]
 We need not in this case address the validity of school action to remove a book from a separate outside reading list. Assuming arguendo that the Hazelwood standard would apply because the scope of curriculum design would include not only required readings but also the selected additional readings which are relevant and appropriate to accomplish the overall goal for the course, the distinction between optional readings appearing in the text itself and optional readings which are merely on a separate, outside reading list might affect the application of the Hazelwood reasonableness test. For example, it might be easier to make such separate, outside readings subject to parental approval, or otherwise limit the imprimatur of school approval
 
 
 [6]
 The comments of protesting parents and Superintendent Pittman might have suggested other possible motivations for the Board action. The specific objections of the protesting parents included: "[b]ad language, sexually explicit story, promotion of women's lib." Superintendent Pittman commented: "that any literature in which God's name is used in vain is not appropriate for use in the classroom."
 Courts have not hesitated to look beyond the stated reasons for school board action. Such scrutiny would be especially proper in the summary judgment posture presented here. However, the parties in this case have clearly stipulated that the motivations of the school board are as set out in the written stipulation, see footnote 7, infra. Thus, in this case, the reasons as stipulated constitute the undisputed facts of the case.
 At the first oral argument held in the district court on the cross-motions for summary judgment, plaintiffs did rely upon the objections of the protesting parents and the comment of the superintendent as evidence of the Board's motivation. That was disputed by the Board, and after full discussion, the district court ordered the parties either to agree upon the facts and stipulate same or to file documents in the nature of a pretrial order indicating the need for an evidentiary hearing to resolve the factual issues. Subsequently, the stipulation concerning the motivations of the Board was filed, and at the subsequent oral argument in the district court it was apparent that all parties agreed that the stipulation reflected the undisputed facts concerning the motivations of the Board. Plaintiffs did not argue in the district court and have not argued on appeal that any genuine issues of fact remain in that regard.
 
 
 [7]
 The stipulation provided as follows:
 "STIPULATION CONCERNING BOARD REASONS
 The parties hereby stipulate that the members of the defendant School Board of Columbia County, if called to testify, would state that they voted to remove Volume I, Humanities, from the curriculum because of the inclusion in it of "The Miller's Tale" and "Lysistrata." The individual Board members would testify that they acted on the basis of some or all of the following reasons:
 
 
 [1]
 The sexuality in the two selections
 
 
 [2]
 A belief that portions of the two selections were excessively vulgar in language and subject matter, regardless of the value of the works as literary classics
 
 
 [3]
 A belief that the subject matter of the selections was immoral, insofar as the selections involved graphic, humorous treatment of sexual intercourse and dealt with sexual intercourse out of wedlock
 
 
 [4]
 A belief that the sexuality of the selections was violative of the socially and philosophically conservative mores, principles and values of most of the Columbia County populace
 
 
 [5]
 A belief that the subject matter and language of the selections would be offensive to a substantial portion of the Columbia County populace
 
 
 [6]
 A belief that the two selections were not necessary for adequate instruction in the course; nor was this particular textbook, in its entirety, necessary for instruction in the course
 
 
 [7]
 A belief that the two selections were inappropriate to the age, maturity, and development of the students in question."
 Stipulation Concerning Board Reasons, filed Oct. 14, 1987, Exhibit A.
 In construing this language, the district court concluded that concern regarding "vulgarity" and the "sexually explicit" character of the materials was the gist of the motivation expressed therein, and the other language was mere elaboration. Virgil, 677 F.Supp. at 1552. Although plaintiffs' brief mentions the phrase, "philosophically conservative mores," we note that the phrase was used only in relation to the "sexuality of the selections." We agree with the district court that the only fair reading of the Board's motivations is that they related to the vulgarity and sexual explicitness of the material.
 
 
 [8]
 Appellants argue that this case is most analogous to the removal of books from a library, and thus that it is governed by Board of Education v. Pico, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (plurality opinion). We disagree. Pico involved a school library, and the plurality took special note of the "unique role of the school library" as a repository for "voluntary inquiry." 457 U.S. at 869, 102 S.Ct. at 2809. More significantly, the Pico plurality held that a school board may not remove books from a school library where a constitutionally impermissible motive--board members' opposition to the content of ideas expressed in the disputed materials--was the "decisive factor" underlying the decision to remove. 457 U.S. at 871-72, 102 S.Ct. at 2810. By virtue of the parties' stipulated reasons for the Board action in this case, the motive at issue in Pico is absent here. See notes 6 and 7, supra. We make no suggestion as to the appropriate standard to be applied in a case where one party has demonstrated that removal stemmed from opposition to the ideas contained in the disputed materials
 
 
 [9]
 The textbook's introduction to the Lysistrata selection explains as follows: "Aristophanes, the only Greek classical comic author whose works survive, composed 'old comedies.' In his comedies, many of the old ritual features of the komos--the big phalluses, padding, animal costumes, grotesque masks, colloquial speech, and obscene jokes--are retained.... Because of its explicitness about sex, Lysistrata was forbidden reading in schools for a long time. Most modern readers, however, with less puritanical attitudes, find it extremely funny." M. Witt. et al., eds. The Humanities: Cultural Roots and Continuities, Vol. I (1980) at 68. Evidently, the attitudes of some "modern readers" have been slower to change than this assessment suggests
 Excerpts from Lysistrata which might reasonably be termed sexually explicit or vulgar include the following:
 LYSISTRATA Darling Lampito, how pretty you are today!
 What a nice color! Goodness, you look as though you could strangle a bull!
 LAMPITO Ah think Ah could! It's the work-out in the gym every day; and, of co'se that dance of ahs where y'kick yo' own tail.
 LYSISTRATA What lovely breasts!
 LAMPITO Lawdy, when y'touch me lahk that, Ah feel lahk a heifer at the altar!
 Humanities, Volume I, at 70.
 * * *
 LYSISTRATA I WILL HAVE NOTHING TO DO WITH MY HUSBAND OR LOVER
 KALONIKE I will have nothing to do with my husband or lover
 LYSISTRATA THOUGH HE COME TO ME IN PITIABLE CONDITION
 KALONIKE Though he come to me in pitiable condition (Oh, Lysistrata! This is killing me!)
 LYSISTRATA I WILL STAY IN MY HOUSE UNTOUCHABLE
 KALONIKE I will stay in my house untouchable
 LYSISTRATA IN MY THINNEST SAFFRON SILK
 KALONIKE In my thinnest saffron silk
 LYSISTRATA AND MAKE HIM LONG FOR ME
 KALONIKE And make him long for me
 LYSISTRATA I WILL NOT GIVE MYSELF
 KALONIKE I will not give myself
 LYSISTRATA AND IF HE CONSTRAINS ME
 KALONIKE And if he constrains me
 LYSISTRATA I WILL BE AS COLD AS ICE AND NEVER MOVE
 KALONIKE I will be as cold as ice and never move
 LYSISTRATA I WILL NOT LIFT MY SLIPPERS TOWARD THE CEILING
 KALONIKE I will not lift my slippers toward the ceiling
 LYSISTRATA OR CROUCH ON ALL FOURS LIKE THE LIONESS IN THE CARVING
 KALONIKE Or crouch on all fours like the lioness in the carving
 Id. at 72.
 * * *
 OLD WOMEN Strip, strip, my women: we've got the veterans on the move! Tangle with me, Gramps, And you'll have cramps For the rest of your days! No more beans! No more cheese! My two legs Will scramble your eggs!
 Id. at 80-81.
 * * *
 LYSISTRATA Oh, quick, girls, quick! Come here!
 FEM CHORAGOS What is it?
 LYSISTRATA A man! A man simply bulging with love! ...
 KINESIAS Oh God! Oh my God! I'm stiff for lack of exercise. All I can to do stand up! ...
 MYRRHINE There we are. Ups-a-daisy!
 KINESIAS So we are. Well, come to bed....
 MYRRHINE Here we are. Up you go!
 KINESIAS Up? I've been up for ages! ...
 MYRRHINE At last! The right bottle!
 KINESIAS I've got the rightest bottle of all, and it's right here waiting for you. Darling, forget everything else. Do come to bed! ...
 Id. at 83-85.
 * * *
 AN ATHENIAN Let's take off our clothes and plow our fields.
 A SPARTAN Ah'll fertilize mahn first, by the Heavenly Twins!
 Id. at 89.
 The editors of Humanities characterize The Miller's Tale as "Courtly Love in a Bawdy Version." Id. at 207. Chaucer, the reader is told, "was interested in a wide range of people and topics, among them the comedy of sex.... The situation of the piece is one typically ripe for sexual hanky-panky...." Id.
 Other scholars have characterized The Miller's Tale as one of several examples in The Canterbury Tales "of the genre of fabliau, which is capable of quite strict definition as a comic tale of low or bourgeois life, involving trickery, often obscene, with a coarse sexual motive." Derek Pearsall, ed., The Canterbury Tales (1985) at 166. The world of The Miller's Tale, it has been said, is one "in which men are aware of the compulsions of the flesh." Derek Traversi, The Canterbury Tales: A Reading (1983) at 70. "The presence of the obscene in The Miller's Tale," observes another writer, "has caused critical problems from the earliest times.... [I]t is evident from the beginning that Chaucer's readers have been reluctant to deal in print with its bold diction and its forthright descriptions of body functions." Thomas W. Ross, A Variorum Edition of the Works of Geoffrey Chaucer, Vol. II, The Canterbury Tales, Part III, The Miller's Tale (1983) at 12-13. "[N]o poet in the whole literary tradition of England," writes a biographer, "can write more titillating poetry than Chaucer's ... as in the Miller's Tale...." John Gardner, The Life and Times of Chaucer (1977) at 119.
 The Miller's Tale contains the following passages which might be found vulgar or sexually explicit:
 "And he slyly caught her by the crotch and said, 'Unless I have my will, through my secret longing for you, I'll die!' And he held her hard by the buttocks, and said, 'Sweetheart, make love to me right now, or, by God, I'll die!' "
 Humanities, Volume I, at 208.
 "Absolon wiped his mouth dry. The night was as dark as pitch, black as coal; and out the window she thrust her hole. And Absolon, as Fortune had in store for him, with his mouth kissed her naked ass with relish before he knew what was happening. He started back and thought something was wrong, for he knew well that women do not have beards and he had felt something rough and long-haired."
 Id. at 212.
 "Nicholas had gotten up to piss and thought he could improve on the joke. He would have Absolon kiss his ass before he left. He quickly raised the window up and slyly thrust his ass far out, buttocks and all, even to the haunches. Then Absolon said, 'Speak, sweet bir. I don't know where you are.' Nicholas at once let fly a fart as great as a thunder clap, that almost blinded Absolon. But he was ready with his hot iron and smote Nicholas in the middle of his ass."
 Id. at 213.
 "Thus was the carpenter's wife screwed in spite of all his care and jealously; and Absolon kissed her lower eye; and Nicholas was burned in the rump."
 Id.
 
 
 [10]
 See footnote 1, supra